## No. 12,014.

## LARISON *v.* TAYLOR.

Decided March 19, 1928. Rehearing denied April 9, 1928.

## Action to cancel deed. Judgment for defendant.

## *Reversed.*

1. APPEAL AND ERROR—*Fact Findings.* Findings of fact by the trial court or jury are conclusive upon reviewing courts in the absence of what, in the record itself, clearly affirmatively shows that the case as made comes within some recognized exception to the general rule.

2. *Setting Aside Decrees.* Courts may set aside findings, judgments or decrees to which a series of improper rulings or actions of the trial court or jury have contributed, no one of which by itself would justify a reversal, but which combined entitle the aggrieved party to a new trial.

3. DEEDS—*Delivery—Record.* Ordinarily a recorded deed may be prima facie evidence of delivery, but the rule is not always applicable.

4. *Delivery—Burden of Proof.* Where delivery of a deed is placed in issue the burden of proof rests upon the party asserting delivery.

5. *Delivery.* Delivery is essential to the complete execution of a deed so as to pass title.

6. *Delivery—Record—Presumption.* There is no presumption of delivery of a deed by recording where it is not recorded until long after its date.

7. *Delivery—Record.* Unauthorized recording of a deed will not constitute delivery.

8. *Delivery—Intention of Grantor.* Intention of the grantor of a deed in making a delivery, if it can be ascertained, governs.

9. APPEAL AND ERROR—*Findings—Erroneous.* In an action to set aside a deed, record reviewed and held, that a finding by the trial court, that there was a delivery of the deed, was clearly against the weight of the evidence, and resulted from a misapprehension of the evidence.

10. NEW TRIAL—*Newly Discovered Evidence—Cumulative.* Admissions or declarations to contradict the testimony of a party are not cumulative. In an action to set aside a deed, affidavit of newly discovered evidence of a disinterested party as to the delivery, presented in support of a motion for new trial, even if cumulative, should have been considered, under the facts disclosed.

11. APPEAL AND ERROR—*New Trial.* It is the province of a reviewing court to grant new trials, and while it is the general rule that fact findings of the trial court based on conflicting evidence will not be disturbed on review, yet to this rule are well recognized exceptions, as where the finding is the result of abuse of judicial discretion, mistake, misapprehension or a misconception of the legal effect of evidence, or where the judgment is but lightly supported by the evidence or manifestly against its weight.

12. TRIAL—*Misconduct of Parties.* The Supreme Court will administer the proper relief when a party to a suit has sought unfairly either with judge or jury to bring about a favorable result to himself.

*Error to the District Court of Boulder County, Hon. Claude C. Coffin, Judge.*

Messrs. RINN & CONNELL, Mr. B. F. REED, Mr. HORACE N. HAWKINS, Jr., Mr. E. W. CHRISTENSEN, for plaintiff in error.

Mr. GEORGE A. MARVIN, Messrs. GOSS & HUTCHINSON, Mr. CHARLES D. BROMLEY, for defendant in error.

*En Banc.*

MR. JUSTICE CAMPBELL delivered the opinion of the court.

THIS action by Hannah C. Larison, widow, seventy-four years of age, is against her married daughter, Anna B. Taylor, and its object is to have cancelled and discharged of record a warranty deed of real estate to Mrs. Taylor as grantee which the plaintiff executed but did not deliver, and which, as she says, was intended solely as in the nature of a testamentary disposition to take effect,

unless previously revoked, only at the time of grantor's death. The answer contains a general denial and an affirmative defense that the deed in question is a warranty deed and was intended to be, and was, an absolute deed conveying full title to the defendant and was delivered by the plaintiff grantor to the defendant grantee and thereafter recorded. The same matter is pleaded as a counterclaim in the answer and denied in the replication, wherein the defendant asks that title to the premises be quieted in her. On trial to the court without a jury, findings were against the plaintiff on the issues tendered by the complaint and the answer, and in favor of the defendant, and upon defendant's counterclaim the findings were for defendant and title in her was quieted accordingly.

The evidence exhibits a lamentable family controversy which courts are sometimes compelled to settle. The general rule with us, as in appellate courts generally, is that findings of facts by the trial court or jury are conclusive upon reviewing courts in the absence of what, in the record itself, clearly and affirmatively shows that the case as made comes within some recognized exception to the general rule. A careful and prolonged study of this record convinces us that, partly through a misconception by the trial court as to the burden of proof, to the indefinite and unsatisfactory character of the testimony of the witnesses for the defendant, to which the trial court attributed undue weight and importance; to the conduct and behavior of the defendant and her husband during the course of the trial and after the case was taken under advisement by the trial court; considered in connection with material and newly discovered evidence that probably would, and should, require different findings and a decree for failure to discover which before the trial plaintiff is not to be penalized; and because of our profound conviction that the trial court incorrectly attached undue probative effect to the testimony of the defendant's several witnesses concerning the alleged de-

livery of the deed as an intended conveyance of present title; we are compelled to set aside its findings and decree and remand the cause for a new trial.

It is within their recognized province, and courts have not infrequently, and properly, set aside findings and judgments or decrees, to which a series of questionable and improper rulings or actions or conduct of the trial court or jury have contributed, no one of which probably would of itself, disassociated from the others, authorize or justify a reversal; but which combined, in justice and equity, entitle the aggrieved party to a new trial.

1. It is apparent from the record that because of her age and physical disability, plaintiff's mental faculty was somewhat impaired and her memory, though not as to the main issue but as to collateral matters, may be at times not strictly accurate. In all material respects her story is plausible, natural and it accords with human experience. About April 8, 1919, the plaintiff was the owner of three lots in the city of Boulder on which was a dwelling house in which she lived as her permanent home. She had been married twice and at the time of the trial had at least two children, one of whom, the defendant Mrs. Taylor, was a child of her second marriage. Both of her husbands were dead. She had one son but whether he was of the first or second marriage does not appear. She was a working woman doing domestic service in homes and work in offices by the day or hour as she could secure employment. She had a savings account at the bank and had accumulated as the result of her labors, and possibly from one or both of her husbands, and possessed at one time several thousand dollars in money, but at the time of the trial she had only about $300 in money in a savings account and the home place, that she owned and in which she lived and it was practically her only property and it came to her from her first husband, not from the defendant's father. It was her purpose and intention, however, that her daughter, Mrs. Taylor, at her death should receive this home place, but she desired to

retain ownership and possession thereof during her life-
time.  Because of her inexperience in such matters, not
being able to determine for herself the way to carry out
her desire, the mother took steps to accomplish the pur-
pose she had in mind by consulting her attorney, who,
after ascertaining her intention, at first suggested mak-
ing of a will, but because of the costs and expenditures
that would be incurred in the probate, which she wished
to avoid, the attorney then explained to her that by mak-
ing a deed of conveyance of her home to her daughter as
grantee, and retaining possession of the deed until about
the time that she was satisfied she was about to die and
then delivering it to her daughter, the purpose she had
in view could be accomplished at less expense, and that
at any time she saw fit, during her lifetime, to change
her mind she could destroy the deed or make other dis-
position of the property at her pleasure.  Acting upon
his advice she requested her attorney to prepare such a
deed, which he did, on April 11, 1919, the instrument be-
ing a warranty deed in form, and she duly acknowledged
the same and after acknowledging it she kept it in her
possession in the drawer of a bureau or sideboard of her
home when it was not in a safety deposit box in a Boulder
bank.  There was no money consideration from the
grantee, Mrs. Taylor, to the plaintiff as grantor for this
conveyance.  The plaintiff had never spoken to her
daughter about it and the latter admits that she never
knew of her mother's purpose, or that any deed had been
executed to her as grantee until December, 1922, about
Christmas time, more than three years after the date it
was signed and acknowledged.  Both the plaintiff and her
attorney, Mr. McHarg, testified positively and explicitly
that it was the fixed purpose and intention of the plain-
tiff to retain title, possession and control of her home
place and of this deed, until about the time when she felt
that she was about to pass on and at such time, unless
she desired to, and did, cancel and destroy the deed prior
to such event, to deliver it to her daughter, the defend-

ant Mrs. Taylor. The plaintiff testifies positively that she never delivered this deed to her daughter or authorized its delivery and that, though the daughter afterwards obtained possession of the deed and had it placed upon the record, it was without her knowledge or consent and contrary to her fixed intention and purpose. Plaintiff further testifies that at all times the daughter had free access to her home and knew where she kept her valuable papers, such as deeds and abstracts and other documents, and that such possession as the defendant acquired of this deed was wrongful and without her authority or consent, and must have been obtained as the result of her own wrongful purpose and design to obtain possession of this property before her mother's death. To sum up, the testimony in behalf of the plaintiff shows a fixed intention and purpose on her part not to make a delivery of this deed to her daughter grantee, but to retain possession and ownership of the home so long as she lived and at her death, by making delivery as above stated, to vest title of the property and not before. After this deed was executed the plaintiff remained in possession of her home, paid the taxes and insurance upon it until the year 1927 and controlled it as her own, and all of her acts and doings with reference to the home were consistent with her entire ownership of it. Repairs were made from time to time upon the dwelling house; plaintiff rented rooms therein to lodgers. Plaintiff further testifies that she told a number of people at different times that she had made a deed of her property to her daughter, but that title was not to vest until her death, she retaining ownership and possession thereof so long as she lived.

The defendant's case may thus be summarized: She testifies that she first moved into the home place to which she asserts title, under the deed above referred to, about the first of March, 1924, and has occupied it ever since up to the time of the trial; she says her mother gave her this deed about Christmas day of 1922. ''I was in the kitchen

of the home where I now live at the time and my husband was present at the time the deed was handed to me by my mother.'' She says that her mother, addressing her by name, handed to her an envelope enclosing the deed in question and said that the daughter was to do with it as she pleased and that it was her present to the latter and part of her estate. The night before, her husband told her that the plaintiff had requested him to tell his wife to come to the plaintiff's residence, as she had a present for her, and it was as the result of this request that she went to her mother's on the following morning when the deed was delivered.. She took this deed home and put it in her trunk and she says that it has been in her possession continuously from that time ever since; that is, in her possession at her home and in her safety deposit vault in a Boulder bank. She had showed this deed to various persons, naming them, at her house, who were witnesses in this case and testified in her behalf. Defendant also says that about the time in 1924 that her mother went to Loveland, a town in an adjoining county, and before she left, she told her daughter that upstairs in a dresser drawer was the abstract for this deed and told her to get it and put the same with the deed, which she did, and she has kept the deed and abstract since that time. The defendant did not place this deed of record at the time of its delivery and not until June 1, 1925, which was after suit was threatened by the mother to cancel the instrument. Defendant says that about the time the mother was going to Loveland she requested her daughter to move into the house and take care of the place and she complied with the request. At that time a Mr. Massey was in possession of the place, or a room in the house, and defendant moved into the house sometime in March, 1925. The defendant produced a letter from her mother of date February 19, 1925, written at Loveland, Colorado. Just what purpose the defendant had in mind in producing the letter is not manifest from its contents, because the letter itself says that if the de-

fendant, to whom the letter was addressed, wants to do so, she can let Massey—who had possession of rooms in the house when the defendant says she moved into it—have or retain the room or rooms that he was then occupying. The letter also says that plaintiff had received $20 from Mr. Massey which he owed her and that she needed it to pay the insurance and the taxes on the premises, which the defendant says had already been deeded to her. The defendant says that her mother went to Loveland just before Thanksgiving time in the year 1924, but that she herself did not actually move into the house and take possession until about the first of March, 1925, and at this time she says the deed in question was in a safety deposit box in a Boulder bank and that she got it from its place of deposit and thereafter she took it to the courthouse and had it recorded June 1, 1925. Defendant admits that, although the deed was given to her in 1922, she paid no taxes on the premises until 1927. She paid none of the insurance; neither does it appear that she ever listed this property for taxation with the county assessor as it was her duty to do under the statute of this state if she was the owner. Defendant's husband testified, corroborating his wife in a measure as to the delivery of the deed and the general tendency of his testimony, so far as it had any bearing at all, was to corroborate in all other particulars the testimony of his wife.

The defendant then produced six witnesses who testified that they saw the identical deed in question at the Taylor home. The testimony of witness Koellner is that in the latter part of November, 1924, prior to or about Thanksgiving time, he was at plaintiff's home place and heard her tell Mrs. Taylor to get an abstract of title and put it with her deed; that he saw at Mrs. Taylor's place this deed in the latter part of September or October, 1924. He was there on some business matter with Mr. Taylor and the latter got a package of papers from a bedroom and among them was this deed. The witness

knows only that the deed was there and knows nothing about how it came to be there. Mrs. Hagman, a sister of the plaintiff, testifies that Mrs. Larison, the plaintiff, went to Loveland before Thanksgiving time, in November, 1924. Just what significance this particular testimony has we do not know, but Mrs. Hagman further says that plaintiff told her that she had made the place over and deeded it to Anna, the plaintiff's daughter, and that the deed was in the bank where she always kept her papers. Not a word about *delivery* of the deed and only that her sister told her that she, plaintiff, herself was keeping it. In March, 1923, Mrs. Hagman, addressing plaintiff, said: "I heard you had given the deed to Anna," to which the sister replied: "I have." The testimony of Mrs. Hagman is strongly relied upon by the defendant in her brief, and is the only specific evidence which we have discovered, aside from that of the defendant and her husband, that there was a delivery. Defendant's counsel in his examination of Mrs. Hagman, apparently not eliciting from her exactly what he desired, she having merely testified about the giving of the deed by her sister to the daugher and that plaintiff said she herself was keeping the deed, made this suggestion to the witness: "In other words, she told you she had delivered it?" to which the witness answered that she had. It is scarcely necessary to say that such testimony is not entitled to credibility. According to the recollection of J. R. Howard, defendant's witness, the plaintiff went to Loveland just before Thanksgiving in 1924. She says that the plaintiff told her that she had given her home place to her daughter. Not a word did the witness utter about delivery of a deed, yet in the next breath, after the alleged statement of plaintiff about giving defendant the home, the witness says that, as the plaintiff was going to live with her son at Loveland, she wanted her to look after the Boulder place, designating it as "her place and notice that nothing was taken." If, as the witness testified, and defendant wishes the court so

to believe, the mother had delivered a deed to the daughter, it is a peculiar request, to say the least, if the plaintiff no longer owned her home place, that she wished the witness Howard to look after it during her absence in Loveland. Scott Betz testified that he heard the plaintiff say that she gave the place to her daughter and for that reason could not trade it to Betz who wanted to acquire it in exchange for some other property. Not a word was said about a delivery of a deed. Even if the plaintiff made this statement about the gift to the daughter, it is not at all inconsistent with plaintiff's claim here that she had made a deed to the daughter to take effect at the death of herself, the grantor. That being true, this testimony is just as consistent with the claim of the plaintiff as it is with the claim of the defendant.

Mrs. McCollum, a sister of the plaintiff, says she saw this deed in February, 1923, at the home of the defendant, Mrs. Taylor. She also testifies that she said to Mrs. Taylor: "Edith (Mrs. Hagman) tells me she (plaintiff Larison) deeded the home place to you," and thereupon the defendant showed Mrs. McCollum the deed and the latter looked it over. This testimony of Mrs. McCollum deserves further consideration as it illustrates the character of the testimony on which the trial court made its findings. She testifies that she had the deed in her own hands and identified it as Exhibit "A" and as the one she saw at Mrs. Taylor's home. Upon cross-examination, when Exhibit "A," the recorded deed, was shown to her, she says it is the same deed which she saw at the home of her niece, the defendant, and she testified specifically that at that time, which was February, 1923, more than two years before the deed was recorded, on the back of it she saw the name: "J. Etta Coons, recorder," which was stamped in purple ink in large letters, and that she also saw stamped in red, printed letters the smaller words: "Compared. Indexed," at the upper right-hand corner of the back of the deed. At the close

of the cross-examination the trial judge evidently realized that the witness was not telling the truth, about seeing the above quoted words on the back of this deed, because the witness was testifying about something that was placed on the deed two years and more after, as she says, it—thus stamped—she saw in her sister's home. These stamped words could not then have been upon the back of the instrument, and so the court at this juncture interrupted the cross-examination and said, after handing her the deed, Exhibit "A": "Now, Mrs. McCollum, look at that carefully on the back and see if everything was there on the back, as you saw it in 1923?" Answer: "Yes, sir, I would think that it was." The defendant's counsel then seeing the dilemma in which the witness had placed herself, interposed with a suggestion to the witness: "This was not on that at that time?" to which the witness answered: "No" and the plaintiff's counsel objected to that and the court admonished defendant's counsel not to ask the witness leading questions like that "which go to her reliability, and very much so." Witness further testified that she could not say that she looked over the deed carefully because she expected to read it over with her glasses later and does not know whether the deed was recorded or not. Thereupon plaintiff's attorney reminded the witness that she had just testified that these purple and red printed marks or words were on the back of the deed when she says she saw it in 1923, and the witness then inquired if she had said that, and at this juncture defendant's counsel interrupting, said to the witness: "Do you wish to correct your testimony in that regard?" to which the witness said: "If I testified to that, I didn't mean to say that." It scarcely needs the suggestion upon our part that the prevarication of the witness is too apparent to require further discussion and this witness' testimony ought to have been placed, and should be placed, in the same category in which the trial court put the testimony of the defendant and her husband. The weight of this testi-

mony is as worthless and inconsistent and improbable as that of the defendant and her husband and should have been, as it was not, disregarded by the trial court. It is pertinent further to say that the witness did not, at the suggestion of defendant's counsel, deny or repudiate her testimony on cross-examination that the red, printed words, "Compared" and "Indexed" were on the instrument at the time she saw it in 1923, but restricted her repudiation to the purple printed stamp of the recorder's name.

We have thus summarized the testimony of the supposed indifferent witnesses on whose testimony the court, after having declared that the testimony of the defendant and her husband was disregarded and rejected as inconsistent with other credible evidence, and after having branded the defendant's husband, at least, as the typical example of the buzzard waiting for its victim to die, based its finding that the plaintiff had delivered to the defendant grantee the deed in question. We are constrained to say that this is a palpable misconception, or misapprehension, of the probative effect of such indefinite and unsatisfactory testimony as to delivery of an instrument. Everything that all of these six witnesses testified to, with the exception noted, about seeing the deed at Mrs. Taylor's home, is consistent with the testimony and claim of the plaintiff that she had executed a deed to her daughter but to take effect only at the death of the grantor. At least it is just as consistent with that testimony as it is with the testimony of the defendant and her husband about delivery. Their testimony was not believed by the court but properly rejected as worthless. The testimony of these other six witnesses on the issue of delivery is not worthy of consideration because, even if it be accepted as true, it is, as we have said, just as consistent with the testimony and claim of the plaintiff that she executed a deed, but did not deliver it, to take effect upon her death, as it is with the testimony of the defendant that the deed was actually delivered in

1922. The testimony of defendant's witnesses about seeing the deed at the Taylor home may be true. The plaintiff herself testifies that the deed, except when it was at the bank and in the possession of her counsel, was always in her home place, to which the defendant had access and knew where it was. She could easily have shown to these various witnesses this deed, even if it had never been delivered to her by the plaintiff.

2. The court in connection with its findings, and in giving its reasons for concluding that there was a delivery of the deed by the grantor to the grantee, stated that the burden was on the plaintiff, and not on the defendant, to disprove delivery and that such burden had not been sustained. Ordinarily a recorded deed may be prima facie evidence of delivery. In the circumstances of this case, however, that rule does not apply. The deed was executed in April, 1919. If it was delivered at all by the plaintiff to her daughter, it was not until December, 1922, more than three years after its execution. It was not recorded until June 1, 1925, more than three years after the alleged delivery and more than six years after signing and acknowledgment. After its alleged delivery the plaintiff remained in exclusive possession of the premises and even, according to the testimony of the defendant, for more than two years thereafter, controlled the property just as fully as she had theretofore. She paid the taxes and insurance on it, made repairs, rented rooms and did all the ordinary acts which an owner of property does with reference to it, all to the knowledge of the defendant. In 18 C. J. p. 413, section 492, the author says that where delivery of a deed is placed in issue, the burden of proof rests upon the party asserting delivery. Mrs. Taylor, the defendant here, asserted that there was a delivery. Delivery is essential to the complete execution of a deed so as to pass title. *Johnson v. Fulk,* 282 Ill. 328, 118 N. E. 706. At page 420, 18 C. J. the author says there is no presumption of the delivery of a deed where it is not recorded until long after its date, citing a large

number of cases. Unauthorized recording of a deed will not constitute a delivery. 18 C. J. p. 207. We think, in the circumstances of this case, that it is more than likely that the court's conclusion, as to delivery, was based upon a misapprehension of the law as to the burden of proof where the delivery itself is, as it is here, in issue and if that was not the sole, it was a material, element in leading the court to its unauthorized finding on this issue in the case.

Furthermore, the authorities seem to be unanimous that the intention of the grantor in making a delivery, if it can be ascertained, governs. There is not the slightest doubt, in our minds, from a careful reading and examination of the record, that the plaintiff never formed, or entertained, the idea of conferring upon defendant ownership of this property during the lifetime of the former. She testified upon the stand that she wanted the daughter to have the property after her death but not before. All her acts and testimony are consistent with this avowed intention and as compared with them the testimony of the defendant is indefinite, unsatisfactory and unreliable as to delivery. It was misapprehension, if not an abuse of discretion, by the trial court and was clearly against the decided weight of the evidence, in finding as a fact that the plaintiff delivered this deed to the defendant at any time, much less with the intent that it should operate as a present vesting of title in the defendant as grantee. It was not until after this suit was threatened that the defendant did any act indicating that she considered herself the absolute and unqualified owner of this property as the result of the alleged delivery of the deed. Her conduct is directly contrary to any such assumption. It is so improbable and unreasonable to conclude that a daughter, in such circumstances, if she had really received an absolute title to this property, and so contrary to human experience, that she permitted her mother to continue to pay taxes and insurance and exercise, after the alleged delivery, the

same acts of ownership which she theretofore had always done. There is testimony in this record, and not denied, that the defendant herself said that the reason she had for accepting the deed was to prevent the son of the plaintiff, who lived in Loveland, from getting the title because, if he did, it would inure to the benefit of a widow with whom at the time he was contemplating marriage.

3. Our conclusion that the decree is wrong and cannot stand is strengthened by the plaintiff's showing in her motion for a new trial that newly discovered testimony, material to the issue of delivery, of which she did not know until after the trial, or that she is not chargeable with neglect for failing sooner to discover, or communicate to her counsel, probably would, and should, lead to a decree in her favor. In her motion, sustained by affidavits, it appears that in the latter part of the year 1924, at a time when the defendant would have us believe that the deed in question was physically in her possession—in fact, she testifies that it was continuously in her possession from the time the plaintiff gave it to her until the time of the trial—the plaintiff called at the bank where she was doing business and the assistant cashier of the bank, at her request, delivered to her a package of papers which theretofore she had left for safekeeping in the bank and which had been there for a considerable length of time before the call, and that among these papers was the identical envelope in which defendant swears that she had always kept this deed from the time of its delivery until the time of this trial, and that the same had been in her possession continuously all that time. If the testimony of the assistant cashier of the bank is true, then it was a physical impossibility for the deed to have been in the possession of the defendant at all the various times mentioned by her in her testimony. The trial court in commenting upon this testimony dismissed it with the observation that the testimony was merely cumulative and might not

strengthen the force of the testimony already produced of the same character. We cannot agree with the trial court in its reasoning. The assistant cashier, so far as anything appears in this record, is an entirely disinterested person. Both the plaintiff and the defendant did business at this bank. There is not the slightest circumstance to indicate that the affidavit of the assistant cashier is untrue or that he would be a prejudiced witness. The testimony itself is not merely cumulative. In 20 R. C. L., New Trial, pp. 298, 299, the author says that admissions or declarations to contradict the testimony of a party are not cumulative. We are of the opinion that this testimony, if there is nothing to indicate that the cashier is untruthful or prejudiced, ought to have, and would have, great weight with any court or jury. But even if it could be properly said that such evidence is merely cumulative, while the ordinary rule on that subject would exclude it, we think, in the peculiar circumstances of this case, it should not be rejected or considered as of no consequence in passing upon a motion for a new trial. Indeed, we think this court would be justified in regarding it as an abuse of discretion with which, in all ordinary circumstances, a trial court is invested. It is true that the assistant cashier, in a subsequent affidavit filed in behalf of the defendant, makes statements that might somewhat restrict the unqualified statement in the affidavit that he filed in behalf of the plaintiff; still, in no substantial respect, would such qualification destroy the effect of the first affidavit that he made.

That it is the province of a reviewing court to grant new trials, even in cases where the facts are found by the court instead of a jury, is conceded, and while the general rule is that, where the conflict in the evidence is substantial, an appellate court will not review it with a view to determine its sufficiency, yet to this rule there are well recognized exceptions, as where the finding is the result of abuse of judicial discretion, mistake, or mis-

apprehension, or misconception, of the legal effect of the evidence, or where the judgment is but lightly supported by the evidence and manifestly against its weight. Many of the authorities in this court are collected in *Thuringer v. Trafton,* 58 Colo. 250, 144 Pac. 866. Under the decision in that case we would be justified in directing a verdict here for the plaintiff, but in the peculiar circumstances of this case we think that adequate relief may be furnished by setting aside the judgment and remanding it for a new trial.

4. There is another reason that contributes to the conclusion which we have reached that a new trial should be granted. We would gladly omit all reference to it were it not that our silence might be misunderstood, and be taken as an approval of an irregularity that might have improperly contributed to the result of the trial in the district court. At the close of the trial, after hearing all the evidence, the court, as already indicated, forcibly expressed itself to the effect that the testimony of the defendant and her husband was so inconsistent with certain facts and circumstances which other evidence, to the satisfaction of the court, had established, that the court was not at all satisfied that the defendant's affirmative defense of delivery was made out, and the court endeavored, without satisfaction to itself, in its examination of the defendant, to have made clear. A remark had been made by counsel, after the evidence was finished, of a possibility of a settlement by the parties themselves, and the court, while having expressed itself, as stated, did not announce its findings, but took the case under advisement, because he was impressed with the hardship that the plaintiff would suffer if the finding should be for the defendant, and the court was willing that the parties might have an opportunity to reach a satisfactory settlement. While the case was thus held under advisement and while the trial judge was in his chambers, defendant and her husband, unsolicited, called upon him,

as the judge supposed, to talk about a settlement of the case. The interview seems not to have been a long one but during the interview the defendant stated that she resented the accusation that she had stolen this deed, and asserted that she did not steal it. The judge, though not reproving her at the time, opened the door for her and her husband to depart from the chambers, which they did. The defendant's counsel, in his argument here, and all parties, and the trial court, concede that such a visit by the parties to a suit, while the same was still pending and undetermined, was "irregular." The counsel for the defendant in his brief admits that it was, while counsel for the plaintiff assert that it was a gross impropriety, and flagrant misconduct, and an endeavor upon the part of the defendant to bring improper influence to bear upon the judge with a view to secure a favorable determination of the action in her favor. In some way the trial court learned, while holding the case under advisement, that the defendant had accused, as the court evidently believed falsely, her attorney of selling out the case to the plaintiff. He, therefore, requested the defendant and her husband and defendant's attorney to come to his chambers, with a view of convincing the defendant that the charge against the attorney was false. Neither the plaintiff nor her conusel was informed in advance of such interviews, and neither plaintiff nor her attorney was present at either of them or knew of them at the time. It should be said in this connection, as indicating the good faith of the trial judge, that before court convened on the adjourned day when the finding and the decree were to be announced, he disclosed to the plaintiff's counsel that such interviews were had. We wish to make it clear that we do not believe that the judge was at the time conscious of any impropriety in his action, but that the sole object was, if possible, to bring about a settlement of the suit and to convince the defendant that her counsel was not guilty of selling her out. The judge himself in passing upon the motion for

a new trial, one of whose grounds was the misconduct of the court and of the defendant, said that nothing occurred during either of these interviews that, in the slightest degree affected his judgment, and that the subsequent findings and judgment for defendant were what he had in mind, and would have made at the close of the trial, had he not desired to give the parties an opportunity to settle their controversy. Reiterating our belief that the trial court was not consciously influenced, at or by either of these interviews, in making findings or rendering a decree, still such an irregularity ought not to be passed by without comment when it is brought to the attention of a reviewing court. The record itself shows, and the declarations of the trial judge just at the close of the trial clearly indicate, that the court was not favorably inclined to the defendant and, indeed, when the judgment was finally pronounced the judge stated in emphatic language that he disregarded the testimony both of the defendant and her husband in reaching his conclusion, and based the same upon what we believe to be, and have said was, a mistaken assumption as to the probative effect of the testimony of disinterested witnesses which made such a case as showed the weight of the evidence preponderated in favor of the defendant as against the plaintiff. It is, as stated, our belief that the judge was not consciously affected by the alleged irregularity, and counsel for the plaintiff admits in his brief his belief in the integrity and honor of the trial judge and admits that he believes that the court was not consciously influenced, nevertheless stated in open court that the trial judge might have been unconsciously influenced by the improper conduct and, that being so, a new trial, as a matter of right, should be granted. This court has had occasion heretofore to express itself as to misconduct of the parties and counsel and has not been slow to administer the proper relief when a party to a suit has sought unfairly, either with the judge or jury, to bring about a

favorable result to himself. In *Grant v. Varney,* 21 Colo. 329, 40 Pac. 771, and *Perry v. People,* 63 Colo. 60, 163 Pac. 844, L. R. A. 1917D, 921, will be found our views upon the subject. In the Grant-Varney case trial was to a jury. The misconduct there was on the part of counsel for plaintiff whose improper remarks at the close of his peroration in his closing argument so stirred the packed courtroom that the audience broke out in prolonged, loud and continuous applause, thereby manifesting their approval of the statements of counsel for the plaintiff. When the jury returned its verdict it included a statement that neither the transgression of counsel nor the applause of the audience influenced them in their deliberation. We set aside the verdict to which such improper conduct on the part of plaintiff's counsel might have contributed and in commenting upon the jury's return said: "Possibly the verdict would have been the same had there been no audience present, and had counsel altogether waived his closing argument." We also said: "The question is not, necessarily or primarily, what effect did such things as happened at the close of this trial have in this particular case, but what tendency do they and would they naturally and probably have with juries in general, in arriving at their verdicts?" So here. The question is not whether the trial court was improperly influenced by defendant's irregularity in seeking a private audience with the judge in his chambers and there making the declarations hereinbefore set out. The question is not what effect such irregularity, as matter of fact, produced, but what effect might it have had upon either a court or a jury. Relief in such cases by way of a new trial is not given for the purpose of punishing the guilty party to the suit, or of awarding his adversary, but to prevent irregularities of this kind which might bring about or produce favorable results to the guilty party. More than this, courts should be jealous to guard themselves and juries against improper approaches of this character. To permit such attempts by a party to a suit to influence

judicial action, either of a court or a jury, is wholly inexcusable and while in this particular instance we are satisfied that the court was not consciously improperly influenced in favor of the guilty party, but, on the contrary, was, as he stated in his oral opinion, prejudiced against her, the fact remains that the defendant secured a favorable decree to which, as we have endeavored to show in this opinion, she was not entitled, and to which this irregularity might have contributed.

Considering all the facts and circumstances of this case, we cannot permit the findings and decree to stand. We believe that, if upon a remanding of the cause it should fall to the lot of the judge who presided at the trial below again to hear it, or if it should be heard by another judge, neither of them will find it difficult to reach the .correct findings of fact and the appropriate decree to enter thereon. In the circumstances of this case it is in the interest not only of justice to a defeated party, but also it is best for the orderly administration of justice, for the trial court, if it desires, to have the opportunity to avoid and correct the mistakes made at the first trial, and wherein, in the second trial, it will be able, unhampered or unembarrassed by the irregularities that occurred below, to arrive at the truth and enter the appropriate decree as foreshadowed in the opinion.

The decree is accordingly reversed to be set aside in its entirety and the cause remanded for a new trial which is to be not inconsistent with the views expressed in the opinion.