239 P.2d 254

**GLANDER v. GLANDER et al.**

No. 7755.

Supreme Court of Idaho.

Dec. 12, 1951.

Rehearing Denied Jan. 14, 1952.

Beckwith & Langley, Twin Falls, for appellant and cross-respondent.

J. W. Taylor, Buhl, Lawrence B. Quinn and Harry Benoit, Twin Falls, for respondent and cross-appellant.

KEETON, Justice.

Arthur. E. Glander brought this action against his sister Gladys, and his brother Wallace, to quiet title to the SE¼ of Sec. 15, Twp. 10 S.R. 13, E.B.M. Defendant W. W. (Wallace) Glander filed a disclaimer, and pending the proceedings, executed and delivered a quit claim deed to the land in controversy to the plaintiff.

Defendant, Gladys C. Glander, appellant here, filed an answer and cross-complaint, praying that she be decreed to be the owner of an undivided one-half interest in the real estate in question.

On issues joined, the cause was tried before the court without a jury and judgment entered in favor of the plaintiff as prayed

in the complaint. From this judgment Gladys C. Glander appealed.

Except where otherwise indicated, respondent and cross-appellant, Arthur E. Glander, will be referred to as plaintiff; appellant and cross-respondent, Gladys C. Glander, will be referred to as defendant.

The pertinent facts are: During the lifetime of John H. Glander and Mary Glander, they acquired title to the SE¼ of Sec. 15, Twp. 10 South, Range 13 East Boise Meridian and the W½ SW¼ and SE¼ SW¼, Sec. 14, Twp. 10 South, Range 13 East Boise Meridian, situated in Twin Falls County, Idaho. The Glanders, including the children, lived on the part of the land located in Sec. 14. The land was all farmed as one piece, each tract being contiguous and adjacent to the other.

On October 31, 1931, the father and mother conveyed by deed to their son, Arthur, the land in controversy, and to their son, Wallace (W. W. Glander), the land located in Sec. 14, on which the residence of the parties was located. This conveyance to the sons was attacked by the Buhl State Bank in a proceedings in which the bank claimed the deed was made in defraud of creditors and the matter was before this court in Buhl State Bank v. Glander, 56 Idaho 543, 56 P.2d 757, in which this court held as between the parties, the deed constituted a valid conveyance subject only to the rights of the Buhl State Bank.

On November 21, 1933, Arthur signed a paper, designated a quit claim deed, describing the SE¼ of Sec. 15, Twp. 10 South, Range 13 East Boise Meridian, in which his brother, Wallace, and his sister, Gladys, were named as grantees, and acknowledged the same before R. B. Smith, a Notary Public. At the same time and place Wallace signed a similar paper in which Arthur and Gladys were named as grantees, covering the land located in Sec. 14 above. These instruments, after being signed and acknowledged, were handed to the father, John H. Glander. He took the same home and from that time until October, 1948, they were kept in the family home with other papers.

In 1936 Arthur married and moved onto the SE¼ of Sec. 15 above, and the farm was thereafter worked jointly by Arthur and Wallace, with some help from the father until about 1946, at which time the father became incapacitated.

In 1937 Gladys (defendant) obtained employment in New York where she has continued to reside. She occasionally made trips to the ancestral home for visits and other reasons. In October 1948, according to her testimony, she *found* the deed which described the land in controversy here, signed by Arthur, plaintiff, in which she and her brother Wallace were named as grantees. She testified:

"Q. Where did you get that deed (referring to the deed under which she claimed title)? A. Off of my brother Wallace's

dresser. It was laying on top. When I was cleaning house, after he had removed the housekeeper from the place.

"Q. I just asked you where you got it. * * *? A. It was laying on top of his dresser, on top of everything there.

"Q. Where was that dresser? A. In the farm house.

"Q. In what part of the farm home? A. His room. His dresser.

"Q. Upstairs or downstairs? A. Upstairs.

"Q. How did you happen to be going through his dresser? A. I wasn't going through his dresser. It was laying on the top of the dresser. He removed the housekeeper. I cleaned house, and it was there."

In a deposition made by the father, he testified in substance that he saw Gladys handling several papers while she was on this visit (1948) and that after she left to return to New York, there was a search made, and the deed signed by Arthur could not be found. Further, that he never delivered the deed to her or to Wallace, and never gave her permission to take the deed or any other papers.

Whether Gladys secured the deed from the top of the dresser or as the fruits of a rummaging expedition through the room and dresser we consider unimportant. No witness testified that the deed was ever delivered to Gladys or to Wallace, or to their father irrevocably, as their representative or agent. He held more as a custodian than as an escrow holder.

On securing possession of the deed as above detailed, she caused the same to be recorded on the 18th of October, 1948.

Shortly after returning to her employment in New York, Gladys, on November 5, 1948, wrote a letter to Arthur. We quote a part as follows:

\* \* \* \* \* \*

"Back before you were married you signed a quit claim deed to all property—the 160 acres on which the small (Brook) house is on. Before I left for home I went in to Twin Falls and filed that deed. This has undoubtedly been in the Twin Falls paper by now.

"At first glance this will look to you as though you had absolutely no further land in your name and that is absolutely true just how (sic) and, unless you now want to go along with me there is bound to be trouble which I do not want I assure you. *If you want to go along with me and not come out on a limb will you go in to see Mr. Rayborn please and he will tell you what my idea is on the matter and how we can straighten out the matter to our mutual benefit.* (Emphasis supplied)

"This seemed to be the only recourse left to me since no friendly settlement could be arranged without a meeting—which was denied me.

\* \* \* \* \* \*

"I do hope that after thinking the matter over you will realize I'm not trying to cut your throat but am only trying to have some settlement of property in the only way

left to me. Do telephone Mr. Rayborn for an appointment and go in and talk to him.

> "Love,
> /s/ Gladys
> Gladys"

We leave the construction and interpretation of this letter as one may see fit, except to say that nowhere in the letter does she claim that the deed was ever delivered to her by Arthur or anyone else having authority to represent him. By inference, she also recognized the fact that Arthur claimed the land.

In her testimony Gladys testified that she had knowledge of the deed long prior to the time she possessed herself of it. Such knowledge, if true, is inconsequential, as it could not be construed as a delivery of the deed to her.

Parenthetically we observe, if Gladys' contention is correct, that the several instruments designated quit claim deeds signed by Wallace and Arthur, covering separate pieces of land, Dated November 21, 1933, were documents which were delivered and transferred title to the lands in question, we would have the following scrambled, conglomerated title: Arthur would be living on, claiming title to, and farming 160 acres of land belonging to his brother Wallace, and his sister Gladys, and so had belonged since November 21, 1933. Wallace would be living on 120 acres of land that he did not own, which belonged to his brother Arthur, and his sister Gladys would be the owner of an undivided one-half interest in both tracts.

Arthur, corroborated by his brother Wallace, testified that he gave the deeds to his father and told him to put them with the rest of the papers and stuff; that he had never seen the deeds subsequent to 1936 when he moved from the land in Sec. 14, to the land in Sec. 15. Further, he had forgotten about signing the deed and that is why he did not take the deed that Gladys caused to be recorded with him when he moved onto the 160 acres in controversy.

Arthur testified that he never authorized anyone to deliver the deed to his sister Gladys. His brother Wallace testified that the deed was never delivered to him, although he had seen it in 1946, and further testified that he never claimed any interest in the land in controversy by virtue of the deed, or otherwise.

The purpose of having the instruments prepared, according to the testimony of Arthur and Wallace, was to act as a testamentary disposition in case one of the brothers should die; the surviving brother could, so they thought, pay the indebtedness existing and furnish a home for the father and mother.

In the court's findings, he found that on the 21st of November, 1933, the plaintiff Arthur E. Glander, made, executed and delivered to his brother W. W. Glander, and his sister, Gladys C. Glander, a quit claim deed conveying said real property, which deed was filed in the office of the Recorder

of Twin Falls County on the 18th of October, 1948.

In a cross-appeal taken by Arthur (plaintiff), this finding is challenged, as not supported by the evidence, or any evidence.

The court further found that the plaintiff, Arthur E. Glander, had acquired title to the land in controversy by adverse possession, and entered a judgment decreeing the plaintiff, Arthur E. Glander, to be the absolute owner in fee simple of said property, and that Gladys C. Glander and W. W. (Wallace) Glander be and are forever barred from any claim of title or interest in the premises. This latter finding is challenged by the defendant, Gladys.

We are of the opinion that the ultimate disposition of the controversy so made by the trial court is correct. We predicate our decision on grounds other than those of the learned trial judge.

The evidence submitted to prove that the deed by which Gladys claims title had never been delivered to Gladys or to Wallace by anyone authorized to deliver it is clear and convincing—in fact, overwhelming, and there is no testimony of material nature which disputes this conclusion.

The appellant contends that the possession of the deed by the grantee, Gladys, and the recording of the same together with the recital at the bottom of the deed that it was "signed, sealed and delivered in the presence of R. B. Smith" is prima facie evidence of the delivery.

In the instant case the deed came into possession of Gladys, not by delivery, but as the result of a finding or rummaging expedition engaged in by her.

Her own testimony and the correspondence indulged in by her after the recording of the deed proves conclusively that there was no delivery by any act of the grantor, custodian, or escrow holder (if there was one), or by the co-grantee, Wallace.

The very definition of a deed that it is a writing, signed, sealed and delivered, negatives the conclusion that the instrument in question ever had any legal, binding force on any of the parties named in it.

Both Wallace and Arthur testified that at the time the instrument in question was signed, they were advised by an attorney that upon the death of one, the deed signed by the one that was deceased could then be recorded by the survivor, and thereby save the cost of probate. There is no doubt in our minds that whether this advice, if given, was correct or incorrect, this was undoubtedly the intention of the grantor, Arthur.

Intention of the grantors (Arthur and Wallace) is a controlling element to determine whether or not there was a delivery.

In Bowers v. Cottrell, 15 Idaho 221, 96 P. 936, this court held: "No particular form of delivery of a deed is required. Whether there was a delivery of a deed so as to pass title depends, in a great measure,

upon the particular circumstances of each case; the test being, was a delivery made by grantor to grantee, or some other person for grantee, and accepted by the grantee with the intention of passing title and making such instrument the deed of the grantor? Delivery includes surrender and acceptance, and both are necessary to its completion. The grantor must be willing and agree to deliver, and the grantee must be willing and consent to receive, and this accord of wills must be evidenced in some way, to show the unequivocal intention of both parties that the instrument shall take effect according to its purport and tenor."

In Flynn v. Flynn, 17 Idaho 147, 104 P. 1030, this court held: "As to what constitutes a sufficient delivery of a deed is largely a matter of intention, and the usual test is: Did the grantor by his acts or words, or both, manifest an intention to make the instrument delivered his deed, and thereby devest himself of title?"

In Crenshaw v. Crenshaw, 68 Idaho 470, 199 P.2d 264, this court again held:

"Placing custody of deed with grantee named therein with understanding it is not to be effective until death is not such 'delivery' as will pass title, but is merely an attempt to make a testamentary disposition of property without complying with statutes regarding wills.

"It is essential to 'delivery' of a deed that there be giving of deed by grantor and a receiving of it by grantee with mutual intention to pass title from one to the other."

For other supporting authorities, see Kester v. Adams, 9 Cir., 85 F.2d 646; Larison v. Taylor, 83 Colo. 430, 266 P. 217; In re Clarke's Estate, 72 Cal.App.2d 817, 165 P. 2d 736; Burgin v. Newman, 160 Kan. 592, 164 P.2d 119; Parker v. Gentry, 62 Ariz. 115, 154 P.2d 517.

This case does not come within the rule that where there is competent, substantial evidence to sustain a finding of a trial court, such finding will not be disturbed on appeal. Thus in Harding v. Home Investment, etc., 49 Idaho 64, 286 P. 920, 297 P. 1101, this court said: "While it is true that, where there is conflict in evidence, trial court's finding will not be disturbed, nevertheless, if evidence does not support finding or if different finding or conclusion is necessitated by proper application of pertinent law, trial court's findings are not binding on reviewing court."

Appellant contends that there is a conflict in the evidence as follows: First, as to whether or not the name of Gladys C. Glander was placed in the deed at the time of its execution. If the deed was never delivered this conflict, if any, is of no importance. Second, defendant contends there is conflict as to whether or not the deed was prepared by E. L. Rayborn. This likewise is unimportant. Third, defendant contends that there is conflict in the evidence as to whether it was signed, sealed and delivered in the presence of the witness R. B. Smith. All the evidence contradicts this last contention and as above stated, at

no place in the testimony did Gladys testify that the deed was ever delivered to her or to her brother Wallace with intent to pass title, or otherwise.

 We therefore conclude that the paper designated quit claim deed, while it was signed and acknowledged, was never delivered. Hence no title or interest ever passed to Gladys.

The question of whether or not Arthur obtained title to the property by adverse possession is therefore unnecessary to decide. Judgment is affirmed. Costs to the respondent and cross-appellant, Arthur E. Glander.

GIVENS, C. J., TAYLOR and THOMAS, JJ., and ANDERSON, D. J., concur.