**TAYLOR, Plaintiff-Appellant, v ROSS, Defendant-Appellee.**

Ohio Appeals, Second District, Montgomery County.

No. 1938.   Decided January 5, 1948.

Joseph W. Sharts, Dayton, Harold H. Singer, Dayton, for plaintiff-appellant, contra the application.

Landis, Ferguson, Bieser and Greer, Dayton, for defendant-appellee and for the application.

## OPINION

By HORNBECK, J.:

The appeal is on questions of law from a judgment of the Common Pleas Court entered on a verdict in favor of the defendant. The action was for personal injuries suffered by plaintiff by reason of an automobile collision between a Hudson owned by defendant, Carl Ross, in which she was riding as a paid passenger, and a Chevrolet operated by Robert Clyde Campbell. The Hudson was moving in a southerly direction on the Springboro Pike on Route 741. The Chevrolet was moving in a northerly direction. The accident occurred about 8:30 o'clock A. M. on December 31, 1943.

The weather at the time of the collision was cold, vision was bad because of frosty or foggy condition, which varied somewhat in pockets of air. The road was slippery, the surface covered with ice and upon the sides of the road the snow was heavy.

Plaintiff alleged that the defendant was negligent in the operation of his automobile at a speed that was greater than reasonable and proper and so as to endanger her life and limb; that defendant drove his automobile on the wrong side of the road, namely, the east side of the center thereof; that he failed to keep the automobile under control and failed to slacken its speed or divert its course to avoid striking the automobile of Campbell. In the amended answer, defendant, in the first defense, after an admission that there was a collision between the automobiles and that plaintiff was injured to some extent, denied generally the other allegations of the amended petition and specifically averred that Campbell was negligently operating his automobile on his left or west side of the road at a speed greater than was reasonable and proper,

namely, 35 miles per hour; that he failed to keep his auto under control; that he operated it without due regard for the right and safety of others in the lawful use of the highway and without keeping a look-out, and without lights, and that by the exercise of ordinary care Campbell should have seen defendant's automobile in time to have averted the collision; that defendant's negligence was the sole cause of collision. The second defense set up a settlement which was pled as a bar and to which because it is not involved in this appeal we will make no further reference. Reply was a denial of the new matter in the amended answer.

Upon submission of the issues the jury returned a general verdict for the defendant and answered negatively the following interrogatory submitted to the jury upon the request of the defendant.

"Was the defendant, Carl Ross, guilty of illegally or unlawfully operating his automobile?"

Seven errors are assigned, many of which consist of numerous sub-headings. We will set them out, as appearing in the brief with the assignment of errors of plaintiff, as we discuss them but not in chronological order.

No. 2: Irregularity and misconduct of jury and defendant, in that defendant during intermissions of the trial through several days talked privately and apart on numerous occasions with four or five of the jurors, and in particular with one Walter S. Dresler who was later the foreman of the jury.

No. 3: Irregularity in the proceedings of said Court and abuse of discretion, in that:

B. The Court overruled plaintiff's objection when upon voir dire defendant's counsel stated that one of plaintiff's counsel had been on the Socialist ticket (although said candidature had occurred more than 12 years before).

C. The Court of its own motion stopped plaintiff from cross-examining defendant's witness, Glanders, a deputy sheriff who on direct examination had testified from memory as to measurements he claimed he had made of the automobile collision three (3) years before,—when plaintiff to impeach the accuracy of his memory inquired how many automobile accidents he had reported since.

3 B is also made the subject of an assignment of irregularity and misconduct of defendant's counsel.

4 F is, that defendant's counsel was chargeable with misconduct in that he "repeatedly greeted the jurors during in-

termissions smiling at them and offering courtesies such as raising or closing the windows for their comfort." No one of these assignments is well made because the rulings of the trial judge were clearly within his discretionary authority which was not abused.

Assignment No. 2 is also not well taken because the acts assigned as misconduct of the jury and the defendant were observed by the plaintiff during the trial, and it thus became her obligation through her counsel to act in a timely manner to bring the alleged misconduct to the attention of the trial judge. **Scheu, et al., v Scheu, etc., et al., 77 Oh Ap 510, 45 Abs. 235, 33 O. L. R. 343, 64 N. E. (2d) 334.**

In holding against the appellant on this assignment we do not approve the conduct of the jurors and the defendant of which complaint is made. Every precaution by observation and admonition should be taken to prevent association, lengthy conversations and social contacts during the trial between a party and the jurors trying his case. Nothing should be permitted which can be prevented to raise even a suggestion of undue influence upon a juror. The physicial handicaps under which trials in the Montgomery County Court House are conducted only accentuates the need for necessary precautionary measures to keep jurors in the proper impartial attitude of mind so vital to their service.

If counsel for plaintiff was of opinion that he was prejudiced in the minds of the prospective jurors because of the statement that he at one time was a candidate for Governor on the Socialist ticket, he should have specifically inquired of them if this fact would prejudice them in any degree against him or his client. 3 "C"—The court could very properly have permitted the questions of Deputy Sheriff Glanders but they are typical of questions which are left almost exclusively to the discretion of the trial judge whether or not they shall be answered.

3 "D". The court ruled plaintiff's witness, Miss Stanton, was not qualified to testify as to the speed of the automobile in which she was riding at the time of the accident, although she had stated she had frequently ridden in automobiles and believed herself capable of estimating speed with reasonable accuracy.

The question presented arose thus:

Q. You have driven an automobile yourself?
A. Yes, sir.
Q. Have you ridden in automobiles frequently?

A. Oh, yes. Several years.

Q. You feel you can estimate speed reasonably well?

A. Reasonably so.

Q. You feel you could estimate reasonably well the speed of the Campbell car that it was being travelled that morning?

A. It was a reasonable rate of speed.

Objection was interposed and sustained. The court made this observation:

"The question is, would you be able, riding in a machine, and not seeing the speedometer, to be able to judge in miles per hour how fast the machine was going?"

A. No, not exactly.

The answer to which the objection was offered was improper for two reasons. First, it was not responsive. The answer should have been "yes" or "no." Second, it was a conclusion that the rate of speed was reasonable, a question for the jury. Following the question by the court and answer thereto.

MR. SINGER; She said, "not exactly"—the court please, I don't think anyone can, not even experts.

A. I certainly would know if it was too fast. I would be nervous.

This was striken on motion. The ruling was manifestly correct.

THE COURT: I don't think she is qualified to testify to speed.

MR. SHARTS: She said she drove a car herself and frequently rode in a car—that is the only way she can qualify.

THE COURT: To qualify, I think she would have to say she attempted to judge the speed and know some degree of accurance of what she was doing riding in the back seat. I don't think she qualifies yet from her own statement.

At this juncture, there was no objection to the ruling of the court nor was the answer of the witness proffered. The record, therefore, is not in proper form to permit appellant to claim the benefit of the assigned error.

Inasmuch as the question may again arise, we venture the opinion that the witness qualified to testify on the question of the speed of the Campbell car. State v Auerbach, 108 Oh St 96, 1 Syl. and pages 98 to 101 inclusive of the opinon.

3 "E". "The court failed to rebuke and check defendant's counsel for sneering remarks in front of the jury alleging that plaintiff's counsel were concealing pictures from the jury."

And this is also made the subject of claim of misconduct against defendant's counsel in 4 "D".

3 "G". "The court of its own motion stopped plaintiff's counsel and rebuked him in the presence of the jury for alluding to the fact that the defendant had not taken the stand for direct examination."

We find no such matter in the bill of exceptions upon which these assignments may be predicated.

4 "C". "He (defendant's counsel) asked plaintiff on cross-examination if her counsel had told her to say, 'wilful and wanton misconduct', and upon her counsel objecting to that as an invasion of privilege (she having made no such statement) he remarked to the jury that counsel were afraid to have the truth come out."

The record shows no such comment by counsel for the defendant at the time of the occurence to which reference is made. Counsel for plaintiff manifested no objection to the procedure when the question as to wilful and wanton misconduct was withdrawn and noted no exception.

4 "E". "He (defendant's counsel) singled out in argument to the jury one Walter S. Dresler by name and drew an illustration from Dresler's business, after having been privately informed by a bystander that if said Dresler were selected as foreman his case was as good as won. Said Dresler did in fact become the foreman."

The argument is approved procedure. The private information which is charged defendant's counsel received from a bystander is not brought onto the record as meretricious conduct involving a party or their counsel nor that the basis for the statement implied misconduct by anyone.

3 "F". "The court admitted over plaintiff's objection defendant's exhibits 1 and 2 to show position of automobiles, although taken more than one hour after collision, when conditions had materially changed, and no proper basis had been laid for their introduction as accurate representations of what

had occurred, and although in exhibit 2 said cars had admittedly been moved and the picture was misleading, showing defendant's car on the other side of the road from where he now swears it was when struck."

Both pictures were properly admitted after one of plaintiff's counsel withdrew his objection. Exhibit No. 1, in probability, showed the true position of the automobiles after they had come to rest and immediately following the collision. They were so firmly attached to each other that it required chains and much power to separate them. It was not claimed, nor should the jury have been misled into believing that exhibit No. 2 portrayed or was intended to portray the relative positions of the automobiles at the time of the collision.

3 "A". "Irregularity in the proceedings of said Court and abuse of discretion, in that:

A. Defendant having cross-examined Plaintiff as to certain statements which he said had been obtained from her by one Heyduck and signed by her on a paper, which statements he selected from said paper and read before the jury, and which appeared to contradict her direct testimony, the Court sustained defendant's objection when plaintiff's counsel thereafter on re-direct examination sought to elicit further testimony from her as to the circumstances under which she had been induced to sign said paper, and as to representations by said Heyduck that had misled her (he being an agent for defendant's insurance company). The Court called counsel into his chambers and threatened to declare a mistrial if plaintiff's counsel inquired as to the nature of said paper or Heyduck's representative capacity. The Court further repeatedly warned plaintiff's counsel that any mention of said insurance company would cause him to direct a mistrial and declared himself ready to do so if defendant so wished because plaintiff's counsel had inquired of her why she had signed said paper."

4 "A" is somewhat similar to 3 "A" namely, "irregularity and misconduct of defendant's counsel in that:

In cross-examining plaintiff he read statements selected from a paper signed by her which he said had been obtained by a "special investigator" named Heyduck, but refused to let

her counsel see the paper, did not offer said paper in evidence nor put said Heyduck on the stand to affirm said statements, and well knew or had means of knowing at the time of the reading from it, that he would not and could not produce said Heyduck or otherwise justify said reading, and that plaintiff would therefore be unable to cross-examine on it."

It appears that on cross-examination counsel for the defendant inquired at considerable length of plaintiff, using as a basis a statement purported to have been made to Heyduck, a special investigator for the Insurance Company with which Ross carried indemnity insurance. There is no doubt of the right of defendant to inquire of the plaintiff whether or not she made statements at other times in conflict with her testimony at the trial. Whether or not such statements were predicated upon written or oral subject matter, if denied, the denials may be adduced to lay the foundation for impeachment of the witness. However, we know of no rule of law which requires the party conducting the cross-examination to offer an impeaching witness nor is it any breach of ethics not to do so. Many reasons may attend why the cross-examining counsel may decide against tendering impeaching testimony nor would the fact that the cross-examiner knew that he would be unable to produce an impeaching witness preclude full examination, the effect of which, in part, would be to lay the foundation for impeachment.

Plaintiff's counsel insist that they had the right to inspect the statement but it does not appear that request to inspect was made. Some discussion of the matter will be found in Jones, The Law of Evidence, Volume 5, par. 847. Manifestly the effect of the answers, unexplained, to the questions in the statement to Heyduck were most damaging to the plaintiff's case and many of them admitted to have been made by the plaintiff, or at least not denied by her, were in direct contradiction of her sworn testimony on material and determinative elements of her case. If, then, the circumstances under which the statement was taken would have the effect of supporting the truth of the testimony of plaintiff, she was entitled to have this factual development brought to the attention of the jury and passed upon.

It was plaintiff's claim that Heyduck, a special investigator for the Insurance Company, came to her home without invitation, entered her room and when she was in no physical condition to be interviewed, still suffering from the after-effects of her serious injuries and but a short time

home from the hospital, having ingratiated himself with her by asserting that he represented Mr. Ross's Insurance Company, and was there for the purpose of a settlement with her, then interviewed her. Plaintiff claimed she was unable to read the statement which Heyduck prepared and so told him, and without reading it to her, and after stating in substance, that it did not mean much anyhow, requested her to sign it, which she did.

Obviously, upon this factual development there arose a question for the decision of the jury whether her testimony in chief had been overcome by the admitted contradictory declarations in the statement, which the trial judge had no right to predetermine. It was a factual issue, the same as any other issue in the case and it affected materially the rights of the plaintiff because it went to the vital question of her veracity.

This testimony of the plaintiff on cross-examination was admissible for two reasons. First, to lay the foundation for impeachment where an answer was denied or the witness said that she did not remember having made the answer as put to her. As to such answers upon impeachment the defendant was bound if he did not elect to put on impeaching testimony.

Second, the evidence was admissible as independent testimony of a party to the fact where the answers constituted admissions. As to these answers the defendant could have offered evidence in opposition.

Upon the right of the witness to explain, it is said in Jones, Law of Evidence, Vol. 5, par. 582.

"Since the principal object of the rule requiring the cross-examiner to lay the foundation for impeachment by interrogating the witness as to his former statements is to prevent injustice to the witness by giving him an opportunity to recollect the facts and to explain any apparent inconsistency, it follows that the opportunity should not be denied on the re-examination. The witness may then be allowed to reaffirm or explain such statements, their meaning and design, and to give the circumstances and influence under which they were made. Considerable latitude must be allowed in the explanation according to the varying "circumstances under which it was made, such as the condition of the witness at the time, physically as well as mentally, and the events operating on the witness" mind from fears of threats, the misapprehension or deception of the witness of what was said, and generally such explanatory statements as an honest witness would desire to make of the inconsistency."

Among many cases cited to support the test is Baum v State, 27 O. C. C., 569.

It is true that where a defendant carries indemnity insurance and by terms of the contract is being represented by counsel employed by the company, it is generally the obligation of counsel and the court to prevent these facts being brought to the attention of the jury. 17 O. Jur. 217. However, this is a rule which has its exceptions as is said at page 217 of 17 O. Jur.

The general rule excluding evidence of the fact that the defendant carries liability or indemnity insurance protecting him from liability for the consequences of his own negligence, like most other rules of evidence, is subject to qualifications and exceptions; such evidence is competent if it tends to prove some material issue properly in the case.

An insurance company is not sacrosanct. It has an interest in a lawsuit in which it may be called upon to pay all or at least a part of a judgment if against the insured. That such interest may at times cause those who represent it to offend against the proprieties is not without the' bounds of reason. It is appropriate and proper that a court should protect it in all of its legal rights but when, and if, a factual situation develops which, if true, establishes an overreaching on the part of its representative in securing information to its advantage, surely opportunity to show this fact will not be denied a party affected.

When, then, the plaintiff undertook to establish that she had been improperly prevailed upon by an agent of the Insurance Company to make statements, when she was not physically qualified to do so, and under circumstances which might create a doubt if the answers as carried into the statement were true and correct and as made by her, the jury had the right to have the full development of this situation.

Upon re-direct examination plaintiff's counsel inquired for whom Mr. Heyduck was investigating, but upon objection answer was not permitted.

Question was then put to the witness,

"Who was he, who did he represent?"

Objection was again interposed which was sustained. Whereupon the court called counsel to the Bench and later in Chambers the following occurred:

THE COURT: Now, Mr. Sharts, do you want to state anything in the record here of the matter of my ruling in connection with this Mr. Heyduck?

MR. SHARTS: We object to the manner in which the question of our right to inquire further into the circumstances, under which the plaintiff signed an alleged document for a Mr. Heyduck, special investigator, was ruled out. We feel that the court should permit us to recall Mrs. Taylor and to ask her as to the circumstances under which she was induced to sign such alleged document. We, therefore, move the court for leave to recall Mrs. Taylor for that purpose.

THE COURT: I will overrule that request.

MR. SHARTS: Note our exceptions. If Mrs. Taylor were to be called for that purpose her answer to the inquiry: "How did Mr. Heyduck induce you to sign that statement?" her answer would be: "He represented himself as trying to settle the case on behalf of Mr. Ross's Insurance Company, the Beacon Insurance Company, and he wrote down statements without showing me what he was writing and asked me to sign, and I was in a condition where I could not see properly on account of the injuries to my head and face and could not properly think on account of the pain in my head and was lying helpless with the cast on my leg and could not properly speak on account of the injuries to my mouth and teeth and. I, therefore, signed the statement incautiously, thinking it was merely preliminary to receiving an offer of settlement. I didn't know that it was being prepared for the purpose of confronting me with it in court against a suit. I was alone at the time."

It is our judgment that the court committed error in refusing at that juncture to accord to the plaintiff the opportunity to explain fully the circumstances under which the statement to Mr. Heyduck was taken including his representations as to the Insurance Company.

Had counsel relied upon the proffer of the testimony of the plaintiff as heretofore quoted, we would say that the ruling of the court was not only erroneous but prejudicial to the rights of the plaintiff.

However, counsel for the plaintiff did not rest upon the record thus made but again put Mrs. Taylor on the stand and developed the fact that Mr. Heyduck called upon her five days from her return to her home from the hospital from which she had been brought in an ambulance; that the fracture of her head which she had suffered had left her with dizzy spells; that Mr. Heyduck just dropped in the afternoon, nobody present but plaintiff's nine year old daughter and a baby; that her husband was not at home but working; that

the witness requested the investigator to wait until her husband returned. He said that he couldn't, that he was in a hurry. To another question as to why he was there, the court sustained an objection. The question was put: "What did he do?" and objection improperly sustained to this question, but no proffer made. Upon inquiry of counsel for plaintiff to counsel for defendant, "Why don't you bring Mr. Heyduck in so that we can talk to him?" The answer was, "Maybe we will", although at the time it was probably known that Mr. Heyduck was not and would not be available to come into court and testify. It further appeared that the investigator sat half way across the room from the plaintiff; that she could not see him; that she was lying flat on her back without a pillow. When she told Mr. Heyduck that she could not read "he said it wouldn't mean too much anyhow, it was for me to get my insurance." Thereupon counsel for the defense asked for a recess and in Chambers the court again cautioned counsel about the testimony and stated that:

"You have deliberately sought to bring this about and if you continue and Mr. Greer makes a motion for mistrial, I presume I will have to grant it. Now, I have some ideas of my own, Mr. Sharts, about this method of insurance companies being able to be in a case and conceal their identity but I think the law at this time in this state is clear on it and I have to follow the law and I think you do too."

The trial judge further amplified his position by saying that at the time when the attempt was made to show the facts under which the statement was made there had only been laid the foundation for impeachment; that if it developed that defendant undertook to impeach, presumably by the testimony of Mr. Heyduck, the court might take a different view of the matter. It later developed that Mr. Heyduck was in a hospital, was not available to testify and would not be used.

As we have heretofore indicated, it is our judgment that the court should have permitted the witness to testify respecting the subject matter heretofore quoted as proffered by her counsel in Chambers, but it will be noted that notwithstanding objections, the witness was permitted to and did testify at length about her physical condition when Mr. Heyduck called, his method and manner of getting into her presence, what he said and what was done, what she said,

that she could not read and told Mr. Heyduck so, his retort to this observation, and finally, that the purpose of taking the statement was for her to get her insurance and this answer was not stricken and but one objection was sustained to the question which elicited the answers. So that, to all intents and purposes everything of substance which was in the proffered testimony which the court refused was eventually testified to by the witness and submitted to the jury, and no further proffer of testimony made nor objection interposed or exception noted. The observations of the court in Chambers were in the absence of the jury and even though not in accord with the law, did not, upon the whole record, prejudice the plaintiff. We have discussed these assignments of error at more length than might be necessary in passing on the narrow question here, so that the court and counsel may have the benefit of our judgment of the law on the subject.

No. 6. "Newly discovered evidence material for plaintiff, which with reasonable diligence she could not have discovered and produced at the trial, e. g.—statements by defendant that flatly contradict his testimony on the stand as to the stand as to the side of road on which he was driving at the time of the collision, and showing the falsity of said testimony."

These affidavits of defendant are to the effect that prior to and at the time of the collision he was because of the crown of the road driving two or three feet to his left and beyond the center of the road.

Upon being called for cross-examination by the plaintiff, defendant was interrogated at length respecting the position of his automobile in the road at and prior to the collision. He was not especially definite upon the subject but said substantially that he rather thought he was not on his left side of the road when 150 to 200 feet from the scene of the accident; that he could have been but he thought not; that he drove about one or one and a half feet from the center of the line which meant, in view of his later testimony, to the right of the center of the road. In response to this question, "As you approached the point where the accident occurred, did you get at any time over on the east side of the road? At the time of the collision, were you on the east or left side of the road?" He answered, "No".

Question: That again is your estimate or guess?

Answer: That is right.

Question: Did you do anything to avoid striking the vehicle.

Answer: No, sir.

The witness said that the fog was very thick; that he could only see a short distance in front of the car, varying from 5 to 35 or 40 feet; that he had no windshield wiper on; that he could not see the white line in the center of the road; that his speed was 20 to 25 miles per hour.

The affidavits of defendant were before the court on motion for new trial. The essentials to be established to require the granting of a new trial on the grounds of newly discovered evidence in Ohio are:

(1) The new evidence must be such that will probably change the result if a new trial is granted;

(2) It must have been discovered since the trial;

(3) It must be such as could not have been discovered before the trial in the exercise of due diligence;

(4) It must be material to the issues;

(5) It must not be merely cumulative to former evidence; and

(6) It must not merely impeach or contradict the former evidence.

30 O. Jur, page 75, and cases there cited.

It is manifest that here we must consider essentials Nos. 1, 5 and 6 because the others are not in dispute.

Upon a careful analysis of the development of this case, it reasonably appears that the most probable cause of the collision was the fact that at the time these cars were on the same side of the road. It is doubtful because of the position of the cars in the highway if the collision could have been averted had both cars been moving as slowly as ten miles per hour. Upon the admission of defendant that he was driving, at the time of the collision, from 20 to 25 miles an hour, the jury could have said that under the driving conditions he was moving at a speed that was greater than reasonable and proper but by its answer to the special interrogatory it found otherwise.

The position of these cars in the road at the time of the collision was the dominant issue. Upon this question we have never seen a record wherein from the animate witness the truth was more difficult to discern nor where some of the testimony was more unusual, unlikely and undependable.

Manifestly, one of these cars, and possibly both of them, was on its wrong side of the road. The persons best qualified to speak on this subject were the drivers of the cars. Let us see what they, and the other witnesses who knew something about this question say. The defendant, as we have heretofore indicated, at the trial, in an uncertain manner, placed himself on his proper side of the road. Campbell, who was charged by the defendant as being the sole cause of the collision, admitted that he was on his left or wrong side of the road. The plaintiff did not speak on the subject because she said that by reason of her injuries and her unconsciousness she could not recall what happened. But she did say on direct examination that her car was swerving coming down the hill at the end of which the collision occurred, when last she remembered its movement. One of the riders with Campbell, Mary L. Stanton, riding in the back seat of the Chevrolet, placed it on the right side of the road at the time of collision while Myra Webster, the other passenger riding in the front seat with the driver, was not interrogated on the question by counsel for either party. Ralph Taylor, husband of plaintiff, testified that the defendant told him that the collision took place in the center of the highway. The defendant denies this statement.

Mr. Raymond J. Zinck, who came on to the scene of the accident from 45 minutes to one hour after its occurence, said that, at that time, the two cars were in the middle of the road; that it looked very much like the Hudson was in the center of the road and the Chevrolet was very much off the right of the road and parallel with the pavement of the highway; that the Chevrolet was to the east or to its right side of the road. The net effect of his testimony was to place defendant's car on the wrong side of the highway and the left front wheel of the Hudson 2½ to 3 feet to the east or the wrong side of the center line of the road. This witness was as well qualified as any except the drivers to definitely fix the location of the cars when they came to rest after the impact. He was disinterested and there is nothing in his answers on cross-examination to weaken the effect of his statements.

Two deputies from the Sheriff's office came onto the scene, one of whom, Heyward Argenbright, was called by the plaintiff, the other, George Glander, by the defendant. Argenbright said that they arrived about 9 o'clock, A. M. These officers state that they were making an official investigation, a copy of the report of which was offered in evidence. In this statement it is said,

"These cars collided in center of road, damage to both cars."

Upon the stand both said that when they found the cars, which by the impact had been driven together and fastened to each other, it was their conclusion that the Hudson, defendant's car, was on its right side of the road, and the Chevrolet, Campbell's car, was on its wrong side of the road. Among other things, the witness, Argenbright, in answers not responsive, clearly conclusions, but to which no objections were interposed, said that,

"The back wheels of the Hudson were setting approximately where they should have been driven without an accident" and that

"The driver of the Hudson car, when they got there, was, at the time of the collision, as much as he could figure, on his right side of the highway."

Specifically, he said that the front wheel of the Chevrolet was to the west of the center or the wrong side of its road from six inches to a foot or a foot and a half. Mr. Glander, upon being interrogated about the statement that the "cars collided in the center of the road" and that there is nothing in the report that states the exact location of the cars at the time, answered—"We don't put that in our report." We have great difficulty in reconciling such a statement because of the variance between the effect of the report and that of the testimony of these witnesses. If the cars were in the center of the road, as the official report states, both drivers were on their wrong side of the center. If the testimony is correct, the Chevrolet only was on its wrong side and the report which is written record of official action is not in accord with the fact. This, indeed, is an unfortunate and an unfavorable development for these officers of the law.

Upon the testimony as to the speed of these cars at the time of and immediately prior to the collision, it is probable that on the slippery surface they did not come to rest after the collision in the exact position where they were located at the time of the impact. So that, deductions made by the Sheriff's deputies and by Mr. Zinck must be considered in the light of all the circumstances. The photo, defendant's exhibit No. 1, does not, in our judgment, tend to establish that the Chevrolet was entirely on its wrong side of the road when

the cars came together. As a matter of fact, from the position of the cars and the place of impact on the Hudson, deduction could logically be made that the Hudson was in the act of swerving toward its west, then being on its east or wrong side of the road and when at an angle, the front of the car facing to. the southwest was struck by the Chevrolet.

In the situation thus created there is projected the affidavit of the defendant, the effect of which is that he was at fault in that he was driving on his wrong side of the road. We are fully cognizant of all the infirmities with which the affidavits of this party are encumbered. We can not say that any jury would accept these statements as the truth, but if it did it should change the verdict. This is especially true because of the close question from all of the other evidence whether the negligence of both drivers was the proximate cause of the collisions.

It has been held that,

"It is the duty of a trial court to grant a new trial where a witness at the original trial subsequently admits under oath that he committed perjury or even that he was mistaken in his testimony, providing such testimony related to a material issue, and was not merely cumulative."

Martins v U. S. C. C. A. (5th) 17 F. (2d) 973. And also that,

"A party's admissions against his interests are independent substantive evidence as against him and their subsequent discovery may be a ground for a new trial, as constituting newly discovered evidence. They are not merely impeaching, nor are they merely cumulative."

Guth v Bell, 153 Iowa, 511, 42 L. R. A. (N. S.) 692, Larison v Taylor, 83 Colo. 430, 266 P. 217, 14 L. R. A. 611. However, the general rule as to a witness is that a new trial will not be ordered on proof of his statement tending to show complete variance with his testimony at the trial. 39 Am. Jur. 169.

Other assignments are presented by appellant which, in our judgment, have been sufficiently considered without special notation in this opinion.

In view of the irregularities to which we have directed attention, none of which when considered alone except one being of sufficient consequence to support a reversal of the judgment but some affecting the orderly procedure of the trial,

and particularly on the ground that the refusal to grant plaintiff's motion for new trial on the basis of newly discovered evidence, which we find to be prejudicial error, the judgment will be reversed and cause remanded.

WISEMAN, PJ, and MILLER, J, concur.

## APPLICATION FOR REHEARING

Decided January 31, 1948.

By THE COURT:
Submitted on application of appellee for rehearing.

The first ground is that the affidavits of defendant Ross should not be accepted by this Court because they were secured by counsel for plaintiff without the knowledge of his, defendant's, counsel. The infirmity of this position is that this information was not developed in the trial court and was not made the subject of any argument in this Court.

The second ground of the application is that we acted without cognizance and appreciation of the law controlling the granting of new trials on the ground of newly discovered evidence. This is misapprehension, as the Court realized that to justify the granting of a new trial on newly discovered evidence it must be such as would reasonably be expected to change the result and that this Court find that the trial judge in not so holding committed error. Our conclusion is that upon the vital question of the subject matter of the affidavits the verdict should reasonably be expected to be different than returned by the jury and carried into judgment by the trial court. Of course, we made the observation that in the last analysis, the credibility of the testimony of the defendant, if in accord with his affidavits, is with the jury.

The first ground of the application is not made on the record; the second ground brings nothing new into the consideration of the errors assigned.

The application will be denied.

WISEMAN, PJ, MILLER and HORNBECK, JJ, concur.