**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ronald Thomas BOHLE, Defendant-Appellant.**

**No. 18604.**

United States Court of Appeals, Seventh Circuit.

June 2, 1971.

Cummings, Circuit Judge, concurred with opinion.

Knoch, Senior Circuit Judge, dissented with opinion.

James H. Pankow, Joseph T. Helling, Philip C. Potts, South Bend, Ind., for defendant-appellant.

William C. Lee, U. S. Atty., Fort Wayne, Ind., Richard L. Kieser, Asst. U. S. Atty., South Bend, Ind., for plaintiff-appellee.

Before KNOCH, Senior Circuit Judge, CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

On January 9, 1969, the destined course of Eastern Airlines Flight No. 831 originating at Miami, Florida was diverted from the Bahamas to Cuba by a procedure variously known as hijacking or skyjacking and sometimes more grandiloquently referred to as air piracy.

Ronald Thomas Bohle was indicted for the act pursuant to 49 U.S.C. §§ 1472 (i) and 1473(a) in the Northern District of Indiana where he stood trial before a jury, resulting in his conviction and sentencing of twenty-five years confinement.

We fail to find in the record any serious, or even token, disputation that Bohle did not board the plane in Miami and after the plane was aloft and over

open water that he did not with the actual use of a switchblade knife and the threatened use of concealed nitroglycerin and a gun persuade a stewardess to take appropriate steps to divert the course of the plane to Cuba.

While the possibility of an insanity defense was alluded to at a hearing on a motion for bond reduction in December 1969, it was not until the second day of the trial on April 24, 1970, after the Government had concluded its case-in-chief, that counsel indicated to the court that insanity was an issue in the case.

Most of the contentions raised on this appeal concern alleged errors occurring during the course of the seven day trial and insofar as pertinent thereto, evidentiary aspects of this case will be set forth in connection with the specific contentions of Bohle for reversal. There are, however, two threshold contentions of error.

## VENUE CONTENTION

Bohle's first contention is that venue was improper in the district court for the Northern District of Indiana, under the provisions of 49 U.S.C. § 1473(a). That section, insofar as here relevant, provides that where, as here, the offense takes place outside any district, "the trial shall be in the district where the offender * * * is arrested or is first brought. If such offender * * * [is] not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender * * *."

A complaint charging Bohle with aircraft piracy was filed with the United States Commissioner in the Northern District of Indiana on June 27, 1969. Bohle was transported to the United States border by Canadian officials on November 2, 1969, entering the United States in the Northern District of New York. He was there arrested pursuant to a warrant issued by the United States Commissioner in Indiana. Following his removal to the Northern District of

Indiana, an indictment was returned in that district on December 15, 1969.

Bohle asserts that venue was lacking in the Northern District of Indiana because he was arrested in the Northern District of New York before the indictment was returned in Indiana. The Government argues in part that the purpose of the venue provision is satisfied by the filing of the complaint in Indiana before Bohle was "arrested or brought into any district. * * *" By this filing, it is contended, the first step was taken leading to the return of an indictment and the prosecution was thus begun in the Northern District of Indiana before Bohle's return to this country.

We need not reach the merits of this phase of the Government's position since even if defendant is correct in asserting that venue was otherwise improper, he has waived any objection he might have had. Venue was challenged for the first time in a motion for acquittal filed at the close of the Government's case. While such a motion is the proper vehicle for asserting objections to venue in some cases, United States v. Jones, 174 F.2d 746 (7th Cir. 1949); 1 Wright, Federal Practice and Procedure: Criminal § 306, p. 600, this is not one of those cases.

■ A challenge to venue in a motion for acquittal is timely only where there is a proper allegation of venue which is not sustained by the evidence. 1 Wright, Federal Practice and Procedure: Criminal § 306, p. 600 and cases cited at n. 9 therein. In such a case the defendant has no notice of a defect of venue until the Government rests without proving what it has alleged. Until he has such notice, there can be no waiver. United States v. Gross, 276 F.2d 816, 819 (2d Cir. 1960), cert. den. 363 U.S. 831, 80 S.Ct. 1602, 4 L.Ed.2d 1525.

■ However, where the fact of improper venue is apparent on the face of the indictment, it has been uniformly held that the objection is waived if not presented before the close of the Govern-

ment's case and perhaps if not presented before commencement of trial. 1 Wright, Federal Practice and Procedure: Criminal § 306, pp. 305–06 and cases cited at nn. 7 & 8 therein.

Bohle attempts to take this case out of this latter rule by arguing that the indictment alleged that his last place of residence was in Michigan City, Indiana, within the Northern District. He maintains that the indictment thus charged proper venue and the defect appeared only when the Government's proof failed to sustain venue in the Northern District of Indiana.

■ This argument distorts the idea of an allegation of proper venue. An indictment alleges proper venue when it alleges facts which, if proven, would sustain venue. Here the indictment alleged facts which, even if proven, would not sustain venue. The defendant was on notice that even if the Government proved all it alleged, proper venue would not be shown.

■ Here the indictment alleged that Bohle's last place of residence was within the Northern District of Indiana and the Government proved that allegation at trial. However, such allegation and proof were insufficient to establish venue in the Northern District of Indiana unless the Government further alleged and proved that the indictment was returned prior to Bohle's return to the United States. That crucial allegation was absent from the indictment and thus the allegation of venue was patently improper. Bohle was chargeable with knowledge of this possible defect in venue which was apparent on the face of the indictment prior to trial. Any objection which he might have raised to it was waived by his failure to assert it until the close of the Government's case.

Specifically, Bohle filed a motion to dismiss on December 23, 1969, prior to his arraignment two months later. In this motion the indictment was challenged on a number of grounds but nothing was even intimated about a venue question although all of the facts

pertaining thereto had to have been known at that time. Rule 12(b) (2) of the Federal Rules of Criminal Procedure requires that any such motion "shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof * * *." However, the court for cause shown may grant relief from the waiver.

No effort to show cause was made and indeed it appears that Bohle's interest was best served by a trial in the Northern District of Indiana.

No doubt if the point had been raised on the motion to dismiss and there had been a ruling favorable to Bohle, his counsel might very well on the facts of this particular case had urgent reasons for then waiving. Neither Bohle nor the alleged offense had any connection with the Northern District of New York. That was merely the fortuitous place of his return to this country. Bohle had lived in Indiana all of his life. He left Indiana only 24 hours before the commission of the alleged offense. All of his lay witnesses and two of his medical witnesses lived in Indiana in close proximity to the court where he was tried. So far as we can determine, none of his witnesses resided closer to the court in New York than to the court in Indiana.

We further note that Bohle first appeared before the commissioner in New York state on the morning of November 2, 1969, at which time he was advised of the charges against him and of his right to counsel including the appointment thereof. Pursuant to his request for counsel, an attorney was appointed who represented him at this preliminary stage. On November 3, 1969, after conferring with the attorney, Bohle appeared before the commissioner and executed a waiver of removal hearing form. Inadvertently, and apparently through a scrivener's error, the commissioner papers were made out for removal to the Southern District of Florida where no charge or complaint was pending against Bohle. The only complaint and

warrant issued for him were from the Northern District of Indiana. That this was a scrivener's error is evident from the order subsequently issued on November 10, 1969 by the United States District Court for the Northern District of New York commanding the marshal of that district to remove Bohle to the Northern District of Indiana, "upon the waiver of a hearing and consent to removal to said District by the said Ronald Thomas Bohle. * * * "

As stated in Chandler v. United States, 171 F.2d 921, 933 (1st Cir. 1948), cert. den. 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949), "It would indeed be unfortunate if we were compelled to hold, on such a highly technical ground, that this elaborate trial has gone for naught."

We find the venue contention of Bohle, asserting improper venue rather than lack of venue, to be without merit.

## CONSTITUTIONALITY OF STATUTE

A section of the statute pursuant to which Bohle was indicted defines the offense involved as "any seizure or exercise of control, by force or violence or threat of force or violence and with wrongful intent, of an aircraft in flight in air commerce." 49 U.S.C. § 1472(i) (2). Bohle's second threshold contention is a challenge to the constitutionality of this section.

Essentially the argument is that Congress must have intended something more than general criminal intent when it required the seizure of an aircraft to be "with wrongful intent" to constitute a crime since general intent is required even if not mentioned. Therefore, Congress, it is asserted, must have intended to require some specific intent as an element of the crime but the word "wrongful" is too vague to describe any specific intent and therefore the statute is unconstitutionally vague. From the cases cited by defendant, it would seem that he believes Congress may have intended to require the specific intent to deprive permanently the owner of his property as is often required in robbery statutes, whether or not specifically set forth.

■■ We are not persuaded by defendant's pedantic reasoning that Congress intended to make the hijacking of an aircraft a crime only if the hijacker intended to deprive permanently the owner of it. We agree with the Government and the district court that the wrongful intent referred to in the statute is no more than the general criminal intent present when one seizes or exercises control of an aircraft without having any legal right to do so.

Bohle's remaining contentions concern alleged errors occurring during the trial. One of these, being claimed error in the giving and refusal to give certain instructions dealing with the intent required and with possible lesser included offenses not requiring some specific intent, necessarily falls with the rejection of Bohle's theory that the statute under which he was indicted requires more than a general criminal intent.

The thrust of the remaining contentions is that allegedly erroneous rulings by the district court severely prejudiced the insanity defense.

## LIMITATION ON ADMISSION OF EVIDENCE

One ruling related to defendant's Exhibit A consisting of medical records covering Bohle's hospitalization and treatment while in the Navy. The district court admitted these records but advised the jury that they were not admitted to prove the truth of the matters stated but merely because they formed part of the basis for expert opinion on Bohle's mental condition in 1969.

The Government points out that among the documents in Exhibit A are certain statements by Bohle's mother to a social worker relating to Bohle's childhood. It defends the ruling of the trial court by asserting, "This sort of material is compounded, unreliable, damaging hearsay of the most obvious sort. That such hearsay is not permitted is so

basic to the rules of evidence as to require no citation of authority." We cannot agree that the matter is so simple.

Section 1732(a), Title 28, United States Code, provides:

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

This statute was intended to permit the admission of business records which carry "a circumstantial guarantee of trustworthiness. The test is one of reliability." United States v. Hickey, 360 F.2d 127, 143 (7th Cir. 1966), cert. den. 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed. 2d 210. It clearly applies in criminal as well as civil proceedings. Hickey, supra; United States v. Ware, 247 F.2d 698, 699–700 (7th Cir. 1957); and Wheeler v. United States, 93 U.S.App. D.C. 159, 211 F.2d 19, 23 (1953), cert. den. 347 U.S. 1019, 74 S.Ct. 876, 98 L. Ed. 1140 (1954). See also Fed.R.Crim. P., Rule 26, 18 U.S.C. Hospitals are included in the statutory phrase "any business." Wheeler, supra; and England v. United States, 174 F.2d 466, 468–469 (5th Cir. 1949). See also Brucker v. Order of United Commercial Travelers, 217 F.2d 876, 881 (7th Cir. 1954).

Thus it is clear that at least some medical records prepared by hospital staffs are admissible in criminal cases. In addressing ourselves to the admissibility of the particular records before us, we deem it important to note that Exhibit A contains three general types of material. It contains material in the nature of a case history consisting largely of statements made by Bohle and third parties, principally his mother, and recorded by members of the hospital staffs. It also contains records concerning the treatment given Bohle and concerning observations made of him which require no special skill and as to which there is little likelihood of disagreement among trained observors. Finally, Exhibit A contains diagnoses, and similar judgment opinions, of Bohle's condition prepared by those who attended him while he was hospitalized.

We do not propose to lay down rigid rules concerning any of these types of material, for in every case "the test is one of reliability," Hickey, supra, 360 F.2d at 143. In each instance, the trial judge must be left some discretion to decide whether, in the words of the Uniform Rules of Evidence, "the sources of information from which [the records were] made and the method and circumstances of their preparation were such as to indicate their trustworthiness." National Conference of Commissioners on Uniform State Laws, Uniform Rules of Evidence, Rule 63 (13). See Judicial Conference of the United States, Proposed Rules of Evidence for the United States Courts and Magistrates, Rule 803 (6) and Advisory Committee's Note, 51 F.R.D. 315, 420 and 426–429 (1971). (Hereafter Proposed Rules for United States Courts). However, some generalizations seem possible and appropriate.

The case history "multiple hearsay" type of material in Exhibit A consists almost exclusively of statements by Bohle and his mother concerning events in his life prior to being hospitalized. Some courts would apparently admit such subjective statements of a patient's history without any express requirement

of an independent exception to the hearsay rule apart from the business record statute. Glawe v. Rulon, 284 F.2d 495, 498 (8th Cir. 1960), and Gaussen v. United Fruit Co., 412 F.2d 72, 73–74 (2d Cir. 1969); Tucker v. Loew's Theatre & Realty Corp., 149 F.2d 677, 680 (2d Cir. 1945); but *cf. contra* Felice v. Long Island R.R. Co., 426 F.2d 192, 196–197 (2d Cir. 1970). *See* Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725, 740–741 (1957) (dissenting opinion), cert. den. 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958); and New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297, 309–310 (1945). *See also* Pekelis v. Transcontinental & Western Air, Inc., 187 F.2d 122, 131 (2d Cir. 1951), cert. den. 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374. *See generally* McCormick on Evidence § 266, p. 564. The purpose for which these courts would admit such evidence is not clear. We find it necessary to distinguish two separate situations.

 First, where such statements of case history are relevant merely because made, we think they are clearly admissible under Section 1732(a) if they meet its conditions. *See* McCormick on Evidence, § 290, p. 611; and 3 Jones on Evidence, § 548, pp. 1066–67 (5th Ed. 1958). Thus, in the instant case, the trial court correctly admitted these multiple hearsay statements in Exhibit A since they formed part of the basis of the expert opinions concerning Bohle's mental condition and were thus relevant whether or not true. It is undisputed that they were taken in the regular course of the hospitals' business and that the hospitals regularly took and promptly recorded such statements.

██ However, the question remains whether the district court was correct in refusing to admit such multiple hearsay for the truth of the matters stated. We think it was. The reason is aptly stated in the following passage:

"These acts were intended to make admissible records which, because made pursuant to a regular business duty, are presumed to be reliable. The mere fact that recordation of third party statements is routine, taken apart from the source of the information recorded, imports no guaranty of the truth of the statements themselves. There is no reason for supposing an intention to make admissible hearsay of this sort. So to construe these statutes would make of them almost limitless dragnets for the introduction of randon, irresponsible testimony beyond the reach of the usual tests for accuracy." Note, Business Entry Statutes, 48 Col.L.Rev. 920, 927 (1948).

*See also* 3 Jones on Evidence § 548, p. 1067 (5th Ed. 1958).

We emphasize that the test is one of reliability. While the recording, in the ordinary course of a hospital's business, of statements by patients and third parties is persuasive of the fact, when relevant, that such statements were made, it does little by itself to add credence to the contents of the statement. Because "the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail." Proposed Rules for United States Courts, Advisory Committee's Note, *supra,* 51 F.R.D. at 427. See also cases cited therein. In such a case, the record is not admissible for the truth of the matters stated, "not because it contains hearsay, but because it was not made in the regular course of business." Standard Oil Co. of California v. Moore, 251 F.2d 188, 214 (9th Cir. 1957), cert. den. 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). *See* Simms v. United States, 101 U.S.App.D.C. 304, 248 F.2d 626, 630 (1957), cert. den. sub nom. Duncan v. United States, 355 U.S. 875, 78 S.Ct. 127, 2 L.Ed.2d 79. *See generally* McCormick on Evidence, § 290, p. 611 and cases cited therein.

Of course, where some independent exception to the hearsay rule is available to lend credibility to the second level hearsay and thus justify its admission, a different case is presented. *See* Proposed

Rules for United States Courts, *supra,* Rule 805, 51 F.R.D. at 445; 2 Jones on Evidence § 316, p. 593 (5th Ed. 1958); McCormick on Evidence § 290, p. 611; and National Conference of Commissioners on Uniform State Laws, Uniform Rules of Evidence, Rule 66. Here, however, no such exception beyond that provided by Section 1732(a) is claimed. Accordingly, the trial court properly admitted the case history portions of Exhibit A under the limiting instruction that they were not to be taken for the truth of the matters stated.

■ Turning to the second general type of material contained in Exhibit A, there seems to be no disagreement, even by courts which take a narrow view of the scope of Section 1732(a), that "regularly recorded facts as to the patient's condition or treatment on which the observations of competent physicians would not differ are of the same character as records of sales or payrolls [and are, therefore, admissible for the truth of the matter stated under Section 1732 (a)]." New York Life Ins. Co. v. Taylor, *supra,* 147 F.2d at 303; Wheeler v. United States, *supra,* 211 F.2d at 23; and England v. United States, *supra,* 174 F.2d at 468–469. This court has previously reached a similar conclusion, Brucker v. Order of United Commercial Travelers, *supra,* 217 F.2d at 881. This agreement also extends to the results of routine tests. *Wheeler, supra,* 211 F.2d at 23, and authorities cited therein; *Taylor, supra,* 147 F.2d at 303–304, and cases cited therein. This court has reached the same result as to analysis of drugs by a government chemist. United States v. Ware, *supra,* 247 F.2d at 699–700. *See generally* 4 Orfield, Criminal Procedure under the Federal Rules § 26.808, p. 425; 3 Jones on Evidence § 548, p. 1066 (5th Ed. 1958); McCormick on Evidence § 290, pp. 609–10; and 6 Wigmore on Evidence § 1707, p. 36 (3rd Ed. 1940).

There are significant amounts of such routine information in Exhibit A, some of which could have been helpful to Bohle's defense of insanity had the jury been allowed to consider it as true. Thus, there are statements that Bohle was originally admitted to a government mental hospital after an attempted suicide and assignment to a cell in the brig "especially for mental cases," and that he was thereafter transferred directly to another government mental hospital. The exhibit also contains particularized statements concerning Bohle's appearance, conduct and reactions. Many of these might also have aided Bohle's defense if taken as true. For example, the exhibit contained records of Bohle's "disheveled, depressed" appearance and of the fact that "it was apparent that his judgment and insight was impaired." Under the instruction of the trial court, the jury could not accept these statements as evidence that Bohle had, in fact, given such appearances. Further, Exhibit A contained statements concerning the treatment given Bohle. Certainly the fact that Bohle was given treatment for a mental condition in the past might have helped his defense had the jury been permitted to accept Exhibit A as evidence that he was in fact given such treatment.

■ Thus, we conclude that the district court erred in instructing the jury that, even as to such routine matters, Exhibit A was not to be taken for the truth of the matters stated.

It may be argued that the limitation on admission of Exhibit A was harmless error since the entire exhibit was before the jury which could very well have taken all of the matters therein as not only being accurate recordations, but accurate as to the content thereof. However, we cannot assume that the jury would have thus disregarded the court's instruction. We are not unmindful of an apparent dilemma because in a converse situation where prejudicial evidence has gone before the jury and is then stricken and the jury admonished to disregard the same, courts sometime take the position that the admonition could not have been effective to have removed the prejudicial effect of the improper evidence.

We cannot here, however, ignore the potential disadvantaged situation in which Bohle found himself of being unable to assert the validity of the matter so recorded. While the judge's admonitory limitation did not deny the truthfulness of the matters, nevertheless, since the district court did expressly state that they were not admitted for their truth, the jury had open to it the possible conclusion that the doctor's testimony based in part upon the recorded data was suspect in having an infirm basis and such opinions were no better than the basis upon which they were founded. In any event, we need not, because we find other errors, determine finally the prejudicial effect of the erroneous exclusions standing alone.

The final type of material found in Exhibit A consists of diagnoses of Bohle's mental condition by members of the hospital staffs. The admissibility of such statements under § 1732(a) has provoked much controversy. The controversy seems not to extend to diagnostic statements based on objective data and presenting no more than average difficulty of interpretation. Even courts which steadfastly oppose the admission of more complex diagnoses concede the admissibility of a diagnosis considered more routine and less conjectural. *See, e. g., Taylor, supra,* 147 F.2d at 303–304. *See generally* McCormick on Evidence § 290, p. 612, n. 33 and authorities cited therein. *See also Brucker, supra,* 217 F.2d at 881.

However, where, as here, diagnoses of mental conditions are involved, there is a strong split of opinion both among and within courts. The opposing positions have been concisely summarized by Chief Judge Murrah in Otney v. United States, 340 F.2d 696, 699–700 (10th Cir. 1965). He finds that courts which exclude hospital records of psychiatrist's opinions "draw a 'distinction between the reasonable reliability of recorded facts on the one hand, and controversial technical opinions on the other' and they regard the 'difference between a "fact" (such as an act, transaction, occurrence or event) and an "opinion"', as fundamental in the law of evidence." *Id.* Those courts which would admit such records view the diagnosis as "a recorded occurrence or event made in the course of the business of operating a hospital * * * [and] can see no basis for drawing a distinction between diagnoses of mental illness and diagnoses of physical illness or, for that matter, between 'facts' and 'opinion'." *Id.*

To this summary, we would add that courts which would exclude records of mental diagnoses stress that because such diagnoses are based so much on judgment and opinion and are so subject to disagreement among trained experts, they must be "subjected to the safeguard of cross-examination of the physician who makes [them]." *Taylor, supra,* 147 F.2d at 304.

Those who would admit such records reply that the circumstantial guarantee of the accuracy of such diagnostic records is greater than average "for the records are made and relied upon in affairs of life and death." Lyles v. United States, *supra,* 254 F.2d at 738–739 (dissenting opinion), citing 6 Wigmore on Evidence § 1707, p. 36 (3rd Ed. 1940); and Thomas v. Hogan, 308 F.2d 355, 361 (4th Cir. 1962), and cases cited therein. Further, it is reasoned, compelling the attendance at trial of all the medical personnel responsible for the diagnostic record "is too serious a price to pay for the doubtful advantage of cross-examining a doctor who [due to the volume of such routine cases] has little or no independent recollection of the subject he has reduced to writing." *Lyles, supra,* 254 F.2d at 738 (dissenting opinion).

In addition, advocates of the admission of these records suggest that all records are subject to error which cross-examination might expose, but that Section 1732(a) nevertheless makes them admissible in reliance upon the circumstantial guarantees of trustworthiness arising from their origin, *id.* at 738–739, and in reliance upon the ability of juries to allow the proper weight to medical opinion of all types, *id.* at 740. Finally, it is

argued that where the circumstantial evidence of trustworthiness is shown to be lacking either by the records themselves or by other evidence indicating that the opinion lacks factual basis or expert qualification, then the records would be barred by the limitations of Section 1732(a) itself and the doctrine of Palmer v. Hoffman, 318 U.S. 109, 111–115, 63 S.Ct. 477, 87 L.Ed. 645 (1943). *Thomas, supra,* 308 F.2d at 361; *Lyles, supra,* 254 F.2d at 740. *See Otney, supra,* 340 F.2d at 700.

The positions taken in this controversy by various state and federal courts are ably summarized, with detailed citations, by Chief Judge Sobeloff in Thomas v. Hogan, *supra,* 308 F.2d at 359–360. *See also* 23 Modern Federal Practice Digest, Federal Civil Procedure, § 1192, for recent cases. The Advisory Committee's Notes to the Proposed Rules for United States Courts, *supra,* 51 F.R.D. at 427–428, indicate a nearly even split in federal courts and note that the trend in state courts favors admissibility. The Proposed Rules, Rule 803(6), would admit diagnostic records. *Id.* at 420 and 428.

Apart from cases already cited sustaining the admission of routine observations and tests. *Ware, supra,* 247 F.2d 698, and *Brucker, supra,* 217 F.2d 876, this court has not been squarely presented the problem of diagnostic records. In a case involving a war risk insurance claim, we noted that the record contained evidence that the plaintiff had been admitted to a hospital and his mental condition diagnosed as psychoneurosis, hysteria. Becker v. United States, 145 F.2d 171, 173 (7th Cir. 1944). However, there was apparently no challenge to the admission of this evidence. Also, it may be questioned whether the evidence was admitted for the truth of the matters stated. *See Taylor, supra,* 147 F.2d at 305 n. 11. We think it clear that *Becker* was not intended to, and did not, resolve the question of the admissibility of records of mental diagnoses. Thus, we must approach it as an issue of first impression in this court.

It may well be that the coexistence of an increasingly complex society and over-burdened courts may in the future necessitate the elimination of some of the evidentiary rules which we have heretofore deemed to be safe-guards for verity. We do not believe that we have arrived at that point, however, with regard to the third type of material under consideration. We concede that the records are made and relied upon in affairs of life and death but the proposed method of introduction would eliminate any direct attack upon the weaknesses or the omissions of the opinions involved. Admittedly too, medical personnel is becoming more reluctant to spend time in the court room. Resort may be more and more to out of court depositions but nevertheless the opponent is able thereby to have the opportunity of confrontation as to a particular opinion.

As a matter of fact, those who in a particular case would desire to gain the admission of the evidence may in some instances suffer by so doing. Thus, some other doctor for the opposition may on the witness stand refer to the opinion and point out that there is no indication therein that a particular aspect had been given consideration. Such aspect may well have been considered by the recording doctor but not deemed to be of such sufficient significance to record. By his not testifying, however, to spell out and defend his position, it is substantially weakened.

Particularly in the matter before us, we are dealing with a field of science in which there are many variables and one in which opinions must perforce be based upon many subjective factors requiring judgment evaluation. Here particularly the party to be confronted by such an opinion should have the full opportunity of cross-examination. We must also keep in mind that cross-examination deals not only with the basis and content of an opinion but with the professional qualification of the person rendering the opinion. This often would not appear in the recorded opinion.

■ For these reasons we are of the opinion that the district court ruled correctly as to the third type of evidentiary material.

Our discussion thus far has assumed that some parts of Bohle's medical records could be admitted as evidence of the truth of the matters stated while other parts could be admitted for the lesser purpose of background without importing verity.

■ At least one court of appeals has found it to be clear error to admit less than the entire record. Harris v. Smith, 372 F.2d 806, 816–817 (8th Cir. 1967), and *Glawe, supra,* 284 F.2d at 498. Where the admission of the entire record is necessary as background for parts otherwise admissible, we agree that it would ordinarily be error to exclude some parts. However, we can find no persuasive reason for an absolute rule on the subject. Certainly, where only part of the record is admissible for the truth of the matters stated, the court should so inform the jury and instruct it that other parts are admissible only as background.

## EXAMINATION BY GOVERNMENT PSYCHIATRIST

Bohle further contends that his Fifth Amendment privilege against self-incrimination was violated when the trial court compelled him to submit to an examination by a Government psychiatrist and so to submit without having his attorney present.

At the time the court ordered the psychiatric examination, Bohle also stated the desire for his psychiatrist to be present. This was not permitted. On the motion for a new trial, the ruling as to the psychiatrist was urged in addition to that pertaining to the presence of counsel. On this appeal, however, the exclusion of the defendant's psychiatrist was not urged as an error and we may deem it waived. If it had been urged, we would have treated this in the same manner as we do hereinafter the request for the presence of counsel.

Nearly two months prior to the beginning of the trial, the Government had moved to have Bohle examined by the Government's own psychiatrist. The motion was denied by the court at that time. At the close of the second day of trial, just prior to the Government's resting its case, when the defendant indicated that insanity was to be an issue, the district court then granted the Government's motion and denied Bohle's request that his counsel be present during the psychiatric examination. The examination was conducted over the weekend and the trial was not interrupted thereby. While there is apparently not entire unanimity on the issue here involved, which to some extent is still a developing concept in the law, in our opinion the better reasoning and result is that which is set forth in United States v. Albright, 388 F.2d 719 (4th Cir. 1958), and we approve the reasoning and result of that case for this circuit.

■ In *Albright,* the court adverted to the applicability of 18 U.S.C. § 4244 which pertains basically to mental competence at the time of trial. We are here concerned with Bohle's mental competence at the time of the incident involved but as did the court in *Albright,* 388 F.2d at 723, we hold that because of the great importance of expert testimony on the issue of insanity and because of the minimal risk to the Fifth Amendment privilege, federal courts have the inherent power to order a defendant to submit to and cooperate with examination by a Government psychiatrist where the defendant's insanity has been made an issue in the case.

■ Such an examination does not violate the Fifth Amendment privilege, because its sole purpose is to enable an expert to form an opinion as to defendant's mental capacity to form a criminal intent. It is not intended to aid in the establishment of facts showing that defendant committed certain acts constituting a crime. It cannot be so used, for it is impermissible to introduce into evidence on the issue of guilt any statement made by the defendant during the course

of such an examination. We note that in the instant case the trial court specifically ruled in granting the examination that "any testimony predicated upon this evaluation will go solely on the issue of insanity or sanity, and no other issue in this case." The rights of the defendant are fully protected by this exclusionary rule.

It is to be noted that the district court did not permit the examination until the point in the trial at which Bohle's counsel indicated that insanity would be an issue, specifically waiving any objection that it was not. Thus, we need not decide at what point in proceedings sanity may be first said to be "an issue" so as to require the defendant to submit to psychiatric examination. We also note, however, that the examination was conducted over a weekend. Apparently the Government did not feel that this time was inadequate although the question presents itself as to whether or not the trial court may not and should not in its discretion permit such time as may be necessary for a thorough going psychiatric examination. Such would seem to be required in the "maintenance of a 'fair state-individual balance.'" *Albright, supra,* 388 F.2d at 724. It is incidentally noted that in *Albright* the trial was in recess for 23 days while the examination was being made. *Id.* at 721.

With reference to the right of counsel to be present at the psychiatric examination, which problem is allied with the right to have the defendant's psychiatrist present, there is also some lack of unanimity in the authorities. Much of the law that has been developed in this area has been in connection with personal injury civil cases. Some differentiation of result has been reached where the examining psychiatrist was the court psychiatrist as opposed to one selected by the Government or petitioning party. See the annotations so differentiating at 64 A.L.R.2d 497 (1959) and 7 A.L.R.3d 881 (1966).

In United States v. Albright, *supra,* 388 F.2d 719, it is not entirely clear from the opinion whether the court appointed the psychiatrist or he was the selection of the Government. However, in that case the court relied on State v. Whitlow, 45 N.J. 3, 210 A.2d 763 (1965). In *Whitlow* it is clear that the psychiatrists were engaged by the State and the court there held that the matter of permitting or not permitting counsel to be present during the examination was discretionary with the court.

In *Albright, supra,* 388 F.2d at 726, the court states that from "the intimate and personal nature of the examination, we are satisfied that, except in the unusual case, presence of a third party in a legal and non-medical capacity, would severely limit the efficacy of the examination, and that if defendant's privilege against self-incrimination is given full effect with regard to his inculpatory statements to his examiner, the need for the presence of an attorney is obviated." We approve of this statement as we do of the statement of the California District Court of Appeals in Durst v. Superior Court, 222 Cal.App.2d 447, 35 Cal. Rptr. 143, 147 (1964), that "the instant case involves a psychiatric examination whose subjective nature requires an atmosphere that is conducive to freedom of expression on the part of the examinee."

 Approving of the rule that this matter is one within the sound discretion of the trial court, we do not find any basis in the record for finding an abuse of discretion in the case before us.

## PSYCHOLOGIST'S REPORT

The psychiatrist who made the examination at the request of the Government was Dr. Grant Metcalfe. Following testimony as to his qualifications, he was interrogated as to the nature of the examination he had made. During the course of this phase of his testimony he stated that Bohle had done a Minnesota Multiphasic Personality Inventory (MMPI). Dr. Metcalfe indicated he was "sort of flabbergasted" by the multiplicity of diagnoses which he had seen in the record, apparently referring to defendant's Exhibit A, so he sent the

MMPI to Newark, New Jersey where the Rosch Institute maintains a computerized scoring service. As of the time of his testimony, he did not have the written report back from New Jersey and had called one of the psychologists at the Institute who said it was in the mail. It had not arrived as of the morning of the doctor's testimony so the doctor's secretary called the Institute and, with the knowledge of the other party, tape-recorded the telephone conversation "wherein he gave her all of the results." The doctor then stated that this report was one of the things he used in arriving at his opinion. When asked what his diagnosis was, Bohle objected.

We are here presented with a preliminary question as to whether the error was preserved on this appeal.

In both the motion for a new trial and upon this appeal, Bohle contends that there was error in permitting Dr. Metcalfe to use as a basis for the opinion he expressed in court, the information acquired by the telephone conversation.[1]

However, the only objection made to Dr. Metcalfe's testifying as to his diagnosis was "I'm going to object insofar as this is partially predicated upon the *psychiatric report* which constitutes hearsay insofar as this place is concerned." (Emphasis supplied.)

■ Technically it would have appeared that the information acquired via telephone was in the nature of a psychological report but inasmuch as the only reports which technically could be referred to as psychiatric which were considered by Dr. Metcalfe were the ones included in defendant's own Exhibit A, we can only assume that it was the telephoned report to which objection was being made. There is no indication that the court understood otherwise and in any event we consider the matter of sufficient importance that we would con-

sider it as a plain error under Rule 52 (b), Federal Rules of Criminal Procedure. *See* 3 Orfield, Criminal Procedure under the Federal Rules § 26:425, p. 746 (1966).

The Government took the position at the time the objection was made that it had made the same objection to the records that were contained in defendant's Exhibit A and it was overruled. While this contention might at first blush seem to have some merit, as we have elsewhere discussed in this opinion, the basis for the admission of Exhibit A, to the extent it was admitted, was 28 U.S.C. § 1732(a) which has no applicability here.

The court overruled the objection, referring to the timing of the raising of the issue and the time under which this (presumably referring to the psychiatric examination) was taken.

The doctor was then permitted to testify as to his diagnosis being that Bohle at the time of the hijacking incident was a sociopath or sociopathic personality. Again, there is an element of confusion in the situation in that the doctor then testified that such a personality is not capable of distinguishing right from wrong. The doctor did then qualify his answer by stating that such personalities might intellectually make the distinction but they did not have the feeling for it. This testimony would seem to have bordered upon support for the defendant's position involving the right-wrong classical McNaughten definition.[2] In any event, the doctor did proceed to state that in his opinion Bohle did not have a mental disease "as we use it here in the courtroom" and he found no signs in his examination that Bohle had ever had a mental disease.

While it might seem that the defendant could have argued rather persuasively that Dr. Metcalfe's testimony was not

---

1. Although designated in the motion for a new trial as a telephone conversation with "somebody in Philadelphia," obviously the reference was to the Newark, New Jersey conversation, being the only one to which Dr. Metcalfe testified.

2. See for a thorough discussion of the matter of definition of mental capacity in regard to the defense of insanity and the adoption of the rule prevailing in this circuit, United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967).

seriously damaging to the defendant under the court's proper instructions on the matter of mental capacity in connection with the insanity defense, nevertheless, there was a sufficiently definite opinion for the jury to the effect that Bohle was not mentally ill to preclude us from saying that the testimony was not in fact damaging in the eyes of the jury.

In considering the question now before us, we pass the double hearsay aspect implicit in the fact that the doctor's secretary added to the hearsay chain but assume for the present purposes the report as given over the telephone by the New Jersey psychologist was accurately relayed to Dr. Metcalfe. The crucial question here is whether the doctor should have been permitted to base his opinion in part upon the telephoned report as to which there was no opportunity of cross-examination of the preparer thereof.

"[I]t is the settled rule that an expert may not give in evidence an opinion which is based upon information gained from the statements of others outside the courtroom, since in such case the opinions would depend upon hearsay." 2 Jones on Evidence § 421, p. 794. *See also* McCormick on Evidence § 15, p. 32.

"The opinion of an expert may be based upon personal knowledge or observation. Generally speaking, the opinion of a medical expert based upon information obtained out of court from third persons is inadmissible. The same rule is followed when the question is the sanity of the defendant." 2 Wharton's Criminal Evidence § 519, p. 344 (12th Ed. 1955).

It may well be that the MMPI consists of some 500 questions, that the administrator of the test, because of subjective factors, would have been in the best position to have evaluated the significance of the test, that under any circumstances the test may not be too significant, that Dr. Metcalfe had the full file before him, and had independently arrived at his own conclusion, that these conclusions and opinions were supported by the Rosch Institute, that the computer was programmed on many cases so that the score there developed would correctly and accurately evaluate the results, that there were no real judgment factors entering into the work performed in New Jersey and that the same opinion would have been arrived at by the doctor even if this test had not been administered. While we do not say the presence of any or all of these factors would have changed the result, none of them was developed in this case either by interrogation of the doctor or in open court by voir dire proceedings. The matter stood only before the jury that the results of a test on which the doctor had in part based his opinion had not been formulated by the doctor but by someone else who was not in court anymore than the results themselves were directly in court.

 Upon the circumstances of this record it was error to permit Dr. Metcalfe to testify as to his opinion.

### CLOSING ARGUMENT

Bohle further urges error prejudicing his defense of insanity arising out of the closing argument of the United States Attorney and the court's comment thereon. While this matter of particular argument may not occur on a retrial, we deem it advisable to address our attention to the matter since it was raised on this appeal and bears on the fairness of Bohle's trial on the insanity issue.

The challenged portion is as follows:

"[PROSECUTOR]: * * * there is a presumption of sanity. Unless the issue is raised by the Defendant, it is not an element that the Government proves. This is a presumption of sanity and not just any evidence that the Defendant would overcome even the presumption. (sic) *You may find that based upon your own observations of the Defendant, and whatever credence you give to the experts, that the presumption is not even overcome.*

* * * * * *

"[DEFENDANT'S COUNSEL]: I'm sorry, Your Honor. *I do object to the fact that the evidence is not enough to overcome the presumption on the question.* I don't think it is proper argument.

"[PROSECUTOR]: I said they might find it, and they might, Your Honor.

"THE COURT: *I think the statement is proper.* You may resume." (Emphasis supplied.)

■ It is our opinion that these statements of the prosecutor, concurred in by the court, could have led the jury to believe that, notwithstanding the substantial evidence of insanity offered by the defendant, it was still open to the jury to weigh the presumption of sanity against him in reaching its verdict. For reasons to be stated, we find this to be an erroneous statement of the law.

There is no question here of the amount of defense evidence necessary to dissipate the presumption of sanity. Whether it be enough "to create a reasonable doubt," Pollard v. United States, 282 F.2d 450, 457 (6th Cir. 1960), merely "any relevant evidence of mental illness before or after the offense," Otney v. United States, *supra,* 340 F.2d 698, or something in between, Hartford v. United States, 362 F.2d 63, 64 (9th Cir. 1966), cert. den. 385 U.S. 883, 87 S.Ct. 174, 17 L.Ed.2d 110, it is clear that the burden was met by the evidence introduced on Bohle's behalf.

In addition to Bohle's own testimony regarding his mental condition, psychiatrists, a psychologist and an osteopathic physician and surgeon testified as witnesses in his behalf. The physician and one psychiatrist had independently observed and treated Bohle at government mental hospitals during 1968 while he was in the Navy. The physician testified that at that time he had found Bohle to be schizophrenic and paranoid-type with impaired judgment and abnormal thought processes. The psychiatrist testified that he had diagnosed Bohle as psychotic-depressive in 1968 and paranoid-schizophrenic at the time of trial.

Generally, the other psychiatrists and the psychologist testified that Bohle was paranoid, schizoid, and psychotic with predisposition to delusions—especially under stress. All three psychiatrists and the psychologist agreed that at the time of the hijacking Bohle was detached from reality and unable by reason of mental disease or defect to control his conduct or to determine between right and wrong. All said Bohle felt he faced a life or death choice when he determined to hijack Flight No. 831 to Cuba.

■ Once sufficient evidence is introduced to rebut the presumption, it disappears and should no longer be weighed by the jury. United States v. Ingman, 426 F.2d 973, 976 (9th Cir. 1970); Brock v. United States, 387 F.2d 254, 257 (5th Cir. 1967); Davis v. United States, 364 F.2d 572, 574 (10th Cir. 1966); Otney v. United States, *supra,* 340 F.2d at 698–699; *contra* Keys v. United States, 120 U.S.App.D.C. 343, 346 F.2d 824, 826 (1965), cert. den. 382 U.S. 869, 86 S.Ct. 144, 15 L.Ed.2d 108.

In taking this position, we note that courts have cited the Supreme Court's landmark decision in Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), on both sides of this issue. There is certainly language in that opinion to support either the position we adopt or its opposite. However, we take the major thrust of *Davis* to be that where the evidence of sanity and insanity is equally balanced, the defendant must prevail and the presumption will not serve to tip the scale against him.

This conclusion is supported by the issue which the Court framed for itself, *id.,* at 478–479, 16 S.Ct. 353; by its first statement of its conclusion rejecting "the doctrine that * * * it is the duty of the jury to convict where the evidence is equally balanced on the issue as to the sanity * * *," *id.* at 484, 16 S.Ct. at 357; and by its stress of the theory that the presumption is merely a matter of trial convenience, " * * * liable to be overcome, or to be so far impaired, in a particular case that it cannot be safely or properly made the basis of

action in that case, especially if the inquiry involves human life * * *," *id.* at 486, 16 S.Ct. at 358.

If the presumption has no evidentiary value when the evidence is equally balanced, it is hard to see how it can ever be evidence. If it cannot tip the scale when the evidence is equal, it certainly cannot add to the evidence of sanity to bring the scale into balance before tipping it. If the scale is already tipped, there is no need for additional evidence to be supplied by the presumption.

Thus we must conclude that certain language found later in the *Davis* opinion, *id.* at 488, 489, 16 S.Ct. 353 which may be taken to indicate that the presumption continues as evidence even after being rebutted, is inconsistent with the major conclusion of the opinion and not entitled to the weight accorded language supporting that conclusion.

We approve of the statement of Chief Judge Murrah in *Otney, supra,* 340 F.2d at 698, as follows:

"The sufficiency of the evidence to overcome the legal presumption of sanity was not within the province of the jury or of concern to it. * * * Instead, the Court should have determined, as a matter of law [where there was sufficient evidence of mental illness] that the presumption of sanity, no longer existed and accordingly instructed the jury that the defendant's mental competency to commit the offense was an essential element of the offense charged and the burden was upon the Government to prove the defendant's criminal responsibility beyond a reasonable doubt."

█ It would appear, therefore, that where there is sufficient evidence there is no place in the court's instructions for reference to the presumption unless in some manner the presumption has become involved before the jury in which event the judge should instruct that the presumption is to be given no consideration.

█ Having thus determined that the presumption is not entitled to be given independent weight by the jury once rebutted and having further determined that the evidence on Bohle's behalf was ample to rebut the presumption, we must conclude that the statement of the prosecutor, concurred in by the court, was erroneous as a matter of law in advising the jury in effect that it could weigh the presumption against Bohle in reaching its verdict.

Further, we find it prejudicially erroneous where the jury is misinformed concerning what it can consider on the critical issue of a case and that misinformation is reinforced by the court after the defendant challenges its accuracy. Nor can we agree with the Government that the effect of such misinformation given under the circumstances here present was overcome by later technical instructions of the court which the Government contends correctly stated the relevant law.

## ATTEMPTED IMPEACHMENT OF STEWARDESS

Bohle's final complaint of error arises from his attempted impeachment of stewardess Joyce Ann Jernigan during her cross-examination as a rebuttal witness.

Jernigan had testified a week earlier as the initial witness for the Government. Her original testimony, at least on direct examination, pertained to the hijacking itself and obviously she was the crew member best acquainted with the happening on the plane. She had been at the rear of the plane when she observed Bohle apparently ill and when she had asked him to sit down beside her thinking she could render aid. At this point she found herself confronted with the switchblade knife. These events commenced shortly after the takeoff and the flight to Cuba itself lasted 45 minutes. During this period, Bohle and his knife were in constant attendance upon the stewardess and apparently while Bohle took her forward to the cockpit and other crew members saw him, the contact was chiefly with Jernigan. After the change of flight pattern had been

established with the cockpit crew, Jernigan and Bohle retired to the first class cabin area from which all other passengers and stewardesses were cleared. Obviously from the testimony, Jernigan was in a position to testify more knowingly than any other crew member concerning not only the happenings of the flight but also with regard to Bohle's demeanor.

At the time of Jernigan's original testimony, the defense of insanity had not been clearly asserted. On cross-examination, the stewardess was asked what she had noticed about Bohle at which time the Government objected, if this pertained to the question of sanity, as being beyond direct examination. We are not quite clear from the transcript just what the basis was for the continued cross-examination along this line of questioning, but in any event the witness was permitted to testify specifically on the cross-examination as to the demeanor of Bohle. She indicated he was very calm, that his manner and voice were normal like anybody else's. Further she said his manner did not change, that his voice did not get louder, but that he was always cool, calm and collected and that she could not tell he was perspiring at all. Further, she testified that it was like he was in command and knew exactly what he was doing.

No effort was made to impeach this testimony nor lay a foundation for impeachment at the time of Jernigan's original testimony, which, as has been said, occurred prior to the assertion of the defense of insanity.

Notwithstanding, the positive testimony of Jernigan as the initial witness concerning the calm and collected demeanor of Bohle, the Government chose to call her as a rebuttal witness, at which time she testified to essentially the same set of facts. The only difference, of course, was that this was directly offered as rebuttal to the claim of insanity. However, as far as we are able to see at this

time the same evidence was already in without qualification in her original testimony.

Be that as it may, Bohle sought to impeach her rebuttal testimony in two respects. The Government did not challenge the attempt with regard to an FBI agent to whom Jernigan had talked in Florida shortly after the return from Cuba. It was stipulated by the Government that if the FBI agent had been called to testify he would have said that it was his recollection when he interviewed Jernigan that she had told him that Bohle appeared to be in a very nervous state and that as they were landing in Cuba, Bohle started to perspire profusely. In these respects her rebuttal testimony was inconsistent with the statement given to the FBI agent.[3]

The other matter of attempted impeachment is that which we have before us as claimed error.

On cross-examination, during the rebuttal period of testimony, after some preliminary questions about Bohle's eyes and whether the stewardess had ever known a person who took dope in New York City, she was asked whether she had said "to anyone about this instance—and I'll read it to you, 'I don't think I'll ever forget his eyes?'" At this point the Government objected and a voir dire hearing was held out of the presence of the jury.

At the conclusion of the voir dire procedure, the defense was denied the right to ask Jernigan, in the presence of the jury, whether she had made the following statement to a Chicago news reporter:

"I don't think I'll ever forget his eyes. He had the most peculiar look in his eyes. Sad. Kind of watery. Glazed. Like he was looking right through you without even seeing you. I think he was on drugs. I had a good friend in New York who took LSD and set himself on fire one time when people convinced him he was

---

3. We note also that the other two stewardesses testified that Bohle had been

excited, nervous and jumpy or shaky at the time of the hijacking.

Jesus Christ; and his eyes used to look just like that. It was creepy."

During the voir dire, Jernigan denied making the remarks about Bohle's eyes and his being on drugs but admitted the statement about a friend in New York. Thereupon, the court ruled that unless defense counsel had someone in court to say that Jernigan did make the statement, she could not be questioned on the matter. The court gave as its reasons that:

"This witness testified a week ago today, and even though that testimony went primarily to what was said and done at that time, there was no reason why—if there is a witness, to-wit, the author of this article—who would testify under oath that these actual words were spoken, there was no reason why that foundation could not have been laid and this witness brought here.

"We are here on the last day of rebuttal, and if the witness is not standing by—and in the absence of that—this prejudicial question will not be put to the jury."

The record shows no response of defense counsel as to the availability of an impeaching witness other than his assertion that it was first necessary to lay a foundation before putting on an impeaching witness.

Bohle here objects, as he did in the trial court, to the voir dire procedure which is claimed to be without precedent and to be prejudicial to defendant's rights of confrontation and due process. Defendant asserts that by compelling the cross-examination of Jernigan to continue in the absence of the jury, the witness was permitted to acclimate and rehabilitate herself out of sight of the jury. Defendant further objects to the ultimate denial of the right to examine Jernigan before the jury concerning the alleged statement.

Where a witness is sought to be impeached on the basis of his prior inconsistent statements, it is generally recognized that a foundation must be laid by calling the alleged statement, together with the time, place and circumstances of its making, to the attention of the witness so that he may admit, explain or deny it. United States v. Hayutin, 398 F.2d 944, 952–953 (2d Cir. 1968), cert. den. 393 U.S. 961, 89 S.Ct. 400, 21 L.Ed. 2d 374; and Burton v. United States, 175 F.2d 960, 965 (5th Cir. 1949), cert. den. 338 U.S. 909, 70 S.Ct. 347, 94 L.Ed. 560 (1950), and cases cited therein. This court has quite recently given implicit recognition to this requirement. Johnson v. Gallatin County, Illinois, 418 F.2d 96, 99–100 (7th Cir. 1969).

However, it has also been held that when an attorney lays such a foundation by confronting the witness with an alleged prior statement which is inconsistent with the testimony of the witness and the witness denies making the statement, it is reversible error to fail to produce the person to whom the statement was purportedly made to contradict the witness. Philadelphia & Reading Ry. Co. v. Bartsch, 9 F.2d 858, 861 (3d Cir. 1925); and Schoolfield v. Witkowski, 54 Ill.App. 2d 111, 125–126, 203 N.E.2d 460, and cases cited therein. *See also* United States v. Goff, 430 F.2d 396, 398–399 (7th Cir. 1970); United States v. Amabile, 395 F.2d 47, 50 (7th Cir. 1968), vacated on other grounds 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); Robertson v. M/S Sanyou Maru, 374 F.2d 463, 465 (5th Cir. 1967); and St. Clair v. Eastern Air Lines, Inc., 279 F.2d 119, 121–122 (2d Cir. 1960).

Thus we conclude that had Bohle's attorney been permitted to confront Jernigan with the statement in the presence of the jury and had she denied it, he would have been under a duty to follow up the impeaching foundation with impeaching evidence. "It would, of course, have been improper for * * * counsel to have read the questions for the purpose of putting their prejudicial content before the jury with no intent to make use of the foundation thus laid by calling [the impeaching witness]." St. Clair, *supra*, 279 F.2d at 122. *But cf.* Wilson v. Ward Baking Co., 318 F.2d 674, 675 (6th Cir. 1963); Taylor v. Ross, Ohio

App., 78 N.E.2d 395, 400 (1948), rev'd on other grounds 150 Ohio St. 448, 83 N.E.2d 222 (1948); and Miller v. Henderson, 41 N.J.Super. 15, 124 A.2d 23, 27–28 (1956).

Bearing in mind that attorneys are officers of the court, we would be, not only of the hope, but of the opinion, that the occasion of putting the prejudicial content before a jury with no intent to make use of the foundation thus laid would be indeed minimal. Nevertheless, the difficult question remains as to how the duty is to be enforced in the rare case to the contrary. In civil litigation and in the case of the prosecution in a criminal case, the duty to follow up foundation with evidence is breached at the risk of reversal of any tainted victory. This after-the-fact sanction is not, of course, available where such an abuse has contributed to a successful criminal defense. Thus it would appear that some before-the-fact regulation may be particularly appropriate in such a situation. This is, of course, not to say that it may not be found appropriate in other situations not now before us.

The voir dire hearing employed by the trial court here was such a before-the-fact proceeding intended to avoid possible abuse. In assessing its propriety, we must be aware of certain fundamental principles concerning the right of cross-examination.

The right, embraced in the Sixth Amendment's confrontation guarantee, is of critical importance in the defense of a criminal prosecution, see Pointer v. Texas, 380 U.S. 400, 403–406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), and a reasonable latitude in its exercise is the "essence of a fair trial," Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931). A major function of cross-examination is to enable the jury to assess the credibility of witnesses. See Douglas v. Alabama, 380 U.S. 415, 418–419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Of particular relevance here

is the "well established [rule] that in criminal cases great latitude is generally permitted in the cross-examination of a prosecution witness in order to test his credibility, especially as to any prior inconsistent statement which could be used in an effort to impeach him." McConnell v. United States, 393 F.2d 404, 406 (5th Cir. 1968).

■ Balancing this interest of the defense in an effective cross-examination against the interest in avoiding abuse of that right, and recognizing the traditionally broad discretion of the trial court in the regulation of cross-examination, we have concluded that there was no error in demanding some assurance of defense counsel that he would follow up any impeaching foundation with evidence. However, we further conclude that it was error to go further and to require defense counsel to continue his cross-examination of witness Jernigan out of the presence of the jury.

■ The Second Circuit has indicated that it would be proper to ask counsel if he intends to follow up an impeaching question and "upon a negative answer to such an inquiry, it would [be] clearly erroneous to permit the [asking of the question]." St. Clair, supra, 279 F.2d at 122. See also Illinois v. Irish, 77 Ill.App.2d 67, 74–75, 222 N.E.2d 114 (1966). Where a trial judge is aware of the possibility that counsel intends to ask an impeaching question having prejudicial implications, it is proper and advisable, in the interests of avoiding abuse and of insuring a fair trial to both the prosecution and the defendant, that the judge inquire of counsel whether the question on which he is about to embark is for the purpose of impeachment and whether and how counsel intends to follow up the question with impeaching proof. If there is no intention to introduce such impeaching proof, the question may, in the court's discretion, be properly excluded.[4]

---

4. In United States v. Standard Oil Co., 316 F.2d 884, 891–892 (7th Cir. 1963), we held it was error to refuse to permit a criminal defendant to lay a foundation for impeachment. We there made no mention of any duty to give assurances that

However, we fail to see what interest is to be served by making opposing counsel and the witness privy to the specific impeaching information. There are certainly interests to be protected by an opposite rule. In the instant case, for example, the witness was permitted time by the voir dire procedure to consider her answer and to eliminate any reaction of surprise to the alleged impeaching material out of the presence of the jury. Such a practice would appear to have a strong tendency to undermine the function of confronting the witness with the question in the first place. The loss to the jury of the witness's initial and immediate response is accompanied by the loss of one potentially significant aspect of the credibility determination. In the usual case, we can see no point in thus weakening the right to an effective cross-examination by use of the voir dire procedure.[5]

The district court here made no inquiry of defense counsel concerning the availability of impeaching evidence before requiring the voir dire. Once the voir dire was held, much of the advantage of the attempted impeachment was irretrievably lost. We think counsel then had a right to stand on his objection to the voir dire procedure without indicating whether he had an impeaching witness immediately available.

Because we find error in the use of the voir dire procedure in this case, we need not address the problem of whether the court, in the light both of Jernigan's previous appearance and of its allegedly limited scope, should have given defense counsel some additional time to secure the presence of any necessary impeaching witness who may not have been immediately available.

Jernigan was an important witness in the Government's case. She was the only Government witness called both in the case-in-chief and in rebuttal. Her credibility was significant on the only real issue in the case—Bohle's mental condition at the time of the offense. Her reliability as a witness to demeanor had already been subjected to appreciable question. We cannot now say that there was no prejudice in preventing further attack on the credibility of her testimony concerning the critical fact of Bohle's appearance and actions at the time of the offense.

We have reached the opinion that a new trial is necessary here with extreme reluctance. It is really not arguable that the jury was amply justified in finding Bohle guilty of the crime charged against him *unless* he was not responsible for his criminal conduct as a result of disease or defect which caused him to lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. United States v. Shapiro, 383 F.2d 680, 684 (7th Cir. 1967). Our reluctance stems from the fact that an able and experienced jurist fairly conducted a trial consuming seven days. We would not lightly set aside the result, yet we cannot be unmindful of considerable public indignation at this particular time toward the crime involved, accompanied by some public lack of understanding, if not indifference or

---

the foundation would be followed by evidence. However, it seems the problem was not presented to the court.

5. We note, however, that exceptional cases are conceivable. For example, where counsel informs the court that he has no impeaching evidence to introduce, the foundation question may be appropriately excluded. Nothing then is to be lost by the voir dire and it may reveal that the witness himself will admit the prior inconsistent statement. There would then be no need of independent impeaching evidence, and questioning before the jury would be appropriate.

A voir dire procedure was approved in another type of impeachment situation not applicable here in United States v. Miles, 413 F.2d 34, 36 (3d Cir. 1969). *See also* Coleman v. United States, 125 U.S.App. D.C. 246, 371 F.2d 343, 344 n. 2 (1966), cert. den. 386 U.S. 945, 87 S.Ct. 979, 17 L.Ed.2d 875 (1967).

even repugnance, toward the defense of mental incapacity.

Therefore, without deciding whether any of the errors recited herein would, standing alone, be of sufficient magnitude in this case to require reversal, we are convinced that, when taken together, their prejudicial impact was sufficient to deny Bohle a fair trial on the issue of insanity. Accordingly, a new trial will be necessary.

For the reasons stated herein, the judgment of conviction and sentence must be reversed and the cause remanded for further proceedings not inconsistent herewith.

Reversed and Remanded.

CUMMINGS, Circuit Judge (concurring).

For the reasons ably expressed by Chief Judge Sobeloff in Thomas v. Hogan, 308 F.2d 355, 358, 361 (4th Cir. 1962), it is my judgment that the diagnostic materials found in Exhibit A should have been admitted for the truth of the matters asserted. This is the position taken by the Supreme Court's Advisory Committee on Uniform Rules of Evidence. See Proposed Rule 803(6) and the note thereon. 51 F.R.D. 315, 420, 426–429.

KNOCH, Senior Circuit Judge (dissenting).

I agree that the procedures dictated in the majority opinion would constitute the better practice. I agree with Judge Pell on the issue of the diagnostic opinions contained in the medical records.

Nevertheless, in the context of the entire trial, the errors noted in Judge Pell's scholarly opinion seem to me not to attain to the gravity of reversible error. Regretfully I dissent from my colleagues' view. I would affirm the judgment of the District Court.